774 N.W.2d 190 (2009)
278 Neb. 599
STATE of Nebraska, Appellee,
v.
Jorge GALINDO, Appellant.
Nos. S-04-443, S-04-1326.
Supreme Court of Nebraska.
October 9, 2009.
*203 Douglas J. Stratton and Andrew D. Weeks, of Stratton & Kube, P.C., Norfolk, for appellant.
Jon Bruning, Attorney General, and Kimberly A. Klein, Lincoln, for appellee.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and SIEVERS, Judge.
McCORMACK, J.

I. NATURE OF CASE

 TABLE OF CONTENTS
 I. Nature of Case ........................................................................ 204
 II. Background ............................................................................ 204
 1. Filing of Information .............................................................. 204
 2. Venue and Venire ................................................................... 205
 3. Trial: Guilt Phase.................................................................. 206
 4. Aggravation Hearing ................................................................ 207
 5. Sentencing ......................................................................... 208
III. Assignments of Error .................................................................. 208
 IV. Standard of Review .................................................................... 209
 V. Analysis .............................................................................. 209
 1. Retroactive Application of L.B. 1 .................................................. 209
 (a) Ex Post Facto .................................................................. 210
 (b) Due Process .................................................................... 214
 (c) Bill of Attainder .............................................................. 215
 2. L.B. 1 as Unconstitutional Scheme .................................................. 216
 (a) Inducement, to Waive Jury Finding of Aggravators ............................... 216

*204
 (b) Ability to Effectively Weigh Aggravating Circumstances and Admissibility of
 Record From Aggravation Hearing ................................................ 217
 3. Notice of Aggravation .............................................................. 218
 4. Jury ............................................................................... 219
 (a) Alleged Inappropriate "Pep Talk" to Jury ....................................... 219
 (b) Failure to Strike Jurors for Cause ............................................. 221
 (c) Venue .......................................................................... 224
 (i) Pretrial Publicity ....................................................... 224
 (ii) Jurors' Statements ....................................................... 226
 (iii) Size of Community ........................................................ 227
 (d) "Life Qualifying" the Venire ................................................... 227
 (e) Minimizing Jurors' Role in Death Penalty Determination.......................... 228
 5. Enmund/Tison ....................................................................... 231
 (a) Step Instruction ............................................................... 233
 (i) Separating Premeditated From Felony Murder ................................ 233
 (ii) Enmund/Tison Findings as Functional Elements of Offense ................... 234
 (b) Bill of Particulars ............................................................ 237
 (c) Whether Eighth Amendment Prohibits Any of Galindo's Death Penalty Sentences .... 237
 6. Evidentiary Challenges Considered During Aggravation and Sentencing Phases ......... 238
 (a) Photograph of Lundell's Body During Aggravation Hearing ......................... 238
 (b) Presentence Investigation Considered by Three-Judge Panel ...................... 240
 (c) Record From Aggravation Hearing ................................................ 242
 (d) Victim Statements Before Sentencing Panel ...................................... 242
 (i) Nebraska Crime Victim's Reparations Act .................................. 242
 (ii) L.B. 1 ................................................................... 243
 (iii) Confrontation ............................................................ 243
 (iv) Neither Nearest Surviving Relative Under ง 30-2303 nor Contained in
 Presentence Investigation Report ......................................... 245
 (e) Failure to Consider First Degree Murder Cases in Which Defendant Was Not
 Sentenced to Death and "Baldus Report" ......................................... 245
 (i) Non-Death-Penalty First Degree Murder Convictions ........................ 246
 (ii) "Baldus Report" ................................ ......................... 246
 (f) Nonstatutory Mitigators ........................................................ 247
 7. Electrocution as Cruel and Unusual Punishment ...................................... 248
 8. De Novo Review ..................................................................... 248
 VI. Conclusion ............................................................................ 248

On September 26, 2002, Jorge Galindo, Erick Vela, and Jose Sandoval entered a bank in Norfolk, Nebraska. Within 40 seconds, the three men had shot and killed four bank employees and one customer. When another customer walked in, but was able to escape, the three men fled. By the time they were apprehended, Galindo, Vela, and Sandoval had broken into two residences and stolen two vehicles, obtaining the keys to one of the vehicles at gunpoint. This case presents Galindo's appeal from his convictions on five counts of first degree murder, six counts of use of a deadly weapon to commit a felony, one count of robbery, and one count of burglary. Galindo was sentenced to death. Galindo does not challenge the sufficiency of the evidence to support the jury's determination of guilt, but he presents numerous arguments as to why he should not be subjected to the death penalty in connection with these crimes.

II. BACKGROUND

1. FILING OF INFORMATION
The information against Galindo was filed on October 22, 2002. The original information did not set forth the alleged aggravating circumstances for death eligibility. However, in response to the subsequent passage of L.B. 1,[1] the State filed an amended information on November 22, containing a notice of aggravating circumstances, as required by the new law. The notice alleged five aggravating circumstances: *205 (1) Galindo had a substantial prior history of serious assaultive or terrorizing criminal activity; (2) the murder was committed in an effort to conceal the identity of the perpetrator; (3) the murder was especially heinous, atrocious, cruel, or manifested exceptional depravity; (4) at the time of the murder, another murder had been committed; and (5) at the time of the murder, Galindo knowingly created a great risk of death to at least several persons.

2. VENUE AND VENIRE
The trial court rejected Galindo's motions for change of venue from Madison County, where Norfolk is located. At the time of Galindo's trial, Norfolk had a population of approximately 25,000 people. In the months before Galindo's trial, there had been a resurgence of publicity due to the 1-year anniversary of the crime and due to the recent legal proceedings of Vela and Sandoval. The media coverage was extensive and included detailed accounts of the evidence adduced in the other two legal proceedings, as well as the final verdicts of guilty and the imposition of the death penalty against those defendants. Coverage also included the planned memorial to the victims, profiles of the victims' families, and the effect of the shootings on the community. Some people interviewed by the media expressed their opinion that the defendants all deserved the death penalty. A relatively small number of articles and news reports involved complaints about the financial burden to the community, the rights given to the bank shooters, and how long it was taking to bring them to justice.
The proposed jury list was composed of 1,615 randomly selected members of the community, who qualified for jury service after answering an eligibility questionnaire.[2] From the jury list, 180 people were randomly selected for a jury pool. The 180 jury pool members were also sent a detailed supplemental questionnaire. Of the 156 respondents, 93 jury pool members, or almost 60 percent, stated that they could lay aside their impressions or opinions and render a verdict based only on the evidence and testimony, and not on sympathy or prejudice. A little less than 29 percent did not believe they could be impartial. The rest were unsure. From the jury pool, 71 people were randomly selected for the venire. The court permitted the parties to conduct lengthy, individual, sequestered voir dire of each prospective juror in the venire. From the venire, 42 prospective jurors were chosen, upon which each party could exercise 12 peremptory challenges, with 2 challenges for each of the alternates.[3]
Most of the 71 potential jurors had some exposure to media accounts relating to the bank shooting. In addition, 29 had a direct or indirect relationship with one of the victims, 4 knew Galindo's family or his exgirlfriend, and several were acquainted with the attorneys or law enforcement personnel that were potential witnesses in the case.
Prior to questioning, the trial judge read for the jury an article describing jury responsibility and the importance of making the sacrifice to serve, despite the inconvenience it might cause. After voir dire was completed, 29 jurors were excused for cause, 21 of those because they admitted that they had already decided that Galindo was guilty and could not be fair and impartial. Of those who were passed to the panel of 42, several had stated in their questionnaire that they could not be fair *206 and impartial, but they were not struck because they reconsidered this position during the voir dire. Eleven opined during voir dire that Galindo was guilty. Sixteen had some relationship with the victims or their families. All of the jurors who ultimately sat at Galindo's trial affirmed under oath that they could decide the case based solely on the evidence presented at trial and upon the judge's instructions as to the law.

3. TRIAL: GUILT PHASE
Galindo's counsel did not dispute the basic details of Galindo's involvement in the crime. A surveillance tape recorded the main counter and lobby area during the robbery. Although the surveillance tape cuts between several cameras and has no sound, it captured most of what occurred. Galindo's theory of defense rested on convincing the jury that the State could not prove the statutory aggravators which would make Galindo eligible for the death penalty. He argued that the robbers had never planned on harming anyone and that instead, it was a tragic "robbery gone bad."
The evidence showed that Galindo and Sandoval had been planning the robbery for at least a month. Sandoval was considered the "leader." Galindo recruited Vela to be the third robber, and Gabriel Rodriguez, Sandoval's half brother, had agreed to act as a scout and driver.
Galindo and Sandoval chose the particular date of the robbery because they knew that the weekly deposit of cash from an armored vehicle would have been made that morning. They chose the particular bank branch because of its relatively small size. The layout of the bank entailed a double-door vestibule that led to a small mezzanine and then to the customer counter. The drive-through service area was located just beyond the customer counter, separated by a small partition. Small sitting areas were situated directly to either side of the vestibule, adjoined by a single office on either side.
While Galindo, Vela, and Sandoval waited in an alley, Rodriguez went into the bank to make a transaction. Communicating through a walkie-talkie, Rodriguez told Sandoval how many people were in the bank and what their locations were at that time. A surveillance tape shows that Galindo entered the bank at approximately 8:44 a.m., with Sandoval and then Vela closely behind him.
Galindo went directly to the office on the left, which was the office of Lola Elwood, the branch manager. Elwood was at her desk conversing with Susan Staehr and Cheryl Cahoy, bank employees. Sandoval went straight to the main counter where Samuel Sun was attending to customer Evonne Tuttle. Employee Jo Mausbach was working at the drive-through window behind Sun. Vela went directly to the right, to the office of personal banker Lisa Bryant.
In his descriptions to law enforcement, Galindo stated that soon after entering the bank, "Sandoval got crazy" and started yelling. Galindo then heard gunshots being fired, and his gun "went off," shooting Elwood three times in the chest. Galindo claimed the trigger on his gun "was very sensitive."
The surveillance tape shows Sandoval brandishing a gun and standing at the counter in front of Sun, with Tuttle beside him. Galindo's back can be seen in the doorway of Elwood's office. As Sandoval leaned against the counter, he motioned Mausbach to him. As soon as Mausbach approached, 23 seconds after the three men had entered the bank, Sandoval shot Mausbach, Sun, and Tuttle at close range and in rapid succession. Around that same time, Vela killed Bryant, shooting *207 her once in her leg and again, at close range, through the back of her neck and hand.
Sandoval then jumped over the counter in an apparent attempt to retrieve money, but, as he did so, customer Micki Koepke walked in. Koepke later recalled that when she was walking from her car toward the building, she had heard a distinct "pop" off to the left and another "pop" off to the right of the entry, but she thought it might be construction. It had been 37 seconds since Galindo and his accomplices entered the bank.
Koepke testified that as she entered through the second set of glass doors, it was strangely silent and she saw Sandoval leaning against the front counter, smiling at her with a gun in his hand. It was not until she saw something move to her left, however, that she registered that the bank was being robbed. Koepke quickly turned and walked back out.
The movement Koepke had detected was Galindo standing in Elwood's office. Galindo fired at Koepke as she exited the vestibule. Glass shattered, injuring her shoulder, but Koepke was able to get to her car and call the 911 emergency dispatch service. One of the bullets fired by Galindo traveled across the street and struck a fast-food restaurant near the drive-through window.
In his confession to law enforcement officers, Galindo claimed he shot at Koepke accidentally. Galindo stated that he saw Vela pointing his gun toward Koepke and that he yelled for Vela not to shoot. Then, according to Galindo, his gun went off. The evidence at trial demonstrated that Galindo shot at Koepke at least twice, and the surveillance video shows Galindo aiming at Koepke in a "modified Weaver stance."
After Koepke escaped, Sandoval jumped back over the counter and the three fled. The tape shows Galindo briefly hesitating back toward the office where Cahoy and Staehr sat crouched with their faces hidden, still unharmed. Cahoy later testified that she heard someone say "hurry up" before the robbers left.
Galindo, Vela, and Sandoval fled on foot, having been abandoned by Rodriguez. They broke into a house nearby, and Galindo acquired keys to a vehicle by pointing a gun at the two women who lived there. This vehicle was eventually abandoned, and the trio stole another vehicle after breaking into a house and finding the keys. Shortly after driving off with this second vehicle and throwing their weapons out the window, they were apprehended.
Galindo eventually led law enforcement officers to where the guns used in the robbery had been disposed of. At the officers' request, Galindo also identified a photograph of Rodriguez. The jury found Galindo guilty of all crimes charged.

4. AGGRAVATION HEARING
At the aggravation hearing, extensive evidence was adduced to show Galindo's prior participation in the murder of Travis Lundell. Lundell was Sandoval's roommate when he was reported missing sometime before the bank robbery. While incarcerated, Galindo eventually led law enforcement officers to where Lundell's body was hidden. The evidence demonstrated that after Galindo recruited Vela, Vela had killed Lundell, with Galindo's assistance, in order to prove himself worthy of the robbery scheme.
The jury also considered the State's evidence of the agonizing nature of the victims' deaths. Bryant's right femur was shattered by a bullet before she fell and was shot through her throat and larynx, causing suffocation by blood filling her air passages. Elwood had fractured ribs, was *208 shot in both lungs and her heart, and died of bleeding into her chest cavity. Mausbach suffered injuries to her jaw and neck, which caused extensive bleeding into her air passages, and she died from obstructed breathing, leaving blood splatters on the wall from her coughing. Sun likewise suffered bleeding into his air passages from a fractured jaw and other internal facial injuries. He also suffered bleeding into his chest cavity as a result of the second bullet that pierced his ascending aorta, heart, and lung. Tuttle died of massive disruption and bleeding in her brain, but the State's expert testified that she lived long enough to experience pain, as evidenced from froth in her air passages.
The jury found all five alleged aggravators. The cause was then put before a three-judge sentencing panel to determine any mitigating circumstances, weigh those against the aggravating circumstances found by the jury, and conduct a proportionality review to determine whether the death penalty would be imposed.

5. SENTENCING
Over Galindo's objection, the panel received into evidence Galindo's presentence investigation report and the record from both the guilt and aggravation phases of the trial. The panel also heard one representative of each of the victims' families read a statement describing their loss. The family representatives did not comment on the crimes, Galindo, or their opinions as to the appropriate punishment for Galindo. The family representatives heard by the panel were Bryant's mother, the guardian of Bryant's 11-year-old son; Sun's ex-wife, mother of their children; Tuttle's eldest daughter; and Elwood's husband. The prosecutor also read for the panel a short statement written by Mausbach's daughter. Galindo objected to the family representatives based on the fact that the statements read were not part of the presentence investigation report and also on the ground that not all of the representatives qualified as a "nearest surviving relative" under Neb.Rev.Stat. ง 29-119 (Cum. Supp. 2004). His objections were overruled.
The sentencing panel refused Galindo's request that it consider, in its proportionality review, other first degree murder cases in which the death penalty was not imposed. The panel also refused to consider evidence referred to as the "Baldus Report."
Galindo made numerous objections to the imposition of the death penalty, which were rejected by the trial court. He objected to electrocution as an unconstitutional method of imposing the death penalty. He also argued that due to the U.S. Supreme Court's decision in Ring v. Arizona,[4] there was no death penalty at the time the crimes were committed and that the death penalty could not be retroactively applied.
The panel found no statutory mitigating circumstances. It considered the nonstatutory mitigating circumstance of Galindo's cooperation with the criminal investigation, but the panel determined that this mitigating circumstance was "offset" by a lack of remorse, an attempted escape, and other misbehavior while incarcerated. The panel found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Galindo to death for each of the five murders. Additional facts relating to Galindo's trial will be discussed in our analysis section below.

III. ASSIGNMENTS OF ERROR
Galindo asserts, consolidated and restated, that the trial court erred in (1) *209 finding that the retroactive application of L.B. 1 did not violate ex post facto principles, due process, or the prohibition against bills of attainder; (2) failing to find that the absence of notice of aggravation in the original information violated due process; (3) failing to find that L.B. 1 was an unconstitutional inducement to waive a jury finding of aggravating circumstances; (4) failing to grant a motion to quash the information that alleged alternative theories of first degree murder; (5) overruling Galindo's step instruction on felony murder; (6) overruling Galindo's motions for change of venue; (7) making inappropriate comments to the venire prior to jury selection that emphasized their duty to serve as jurors; (8) informing the jury during voir dire that it would have no role in sentencing; (9) failing to allow Galindo to "`life qualify'"[5] the venire; (10) failing to strike certain jurors for cause; and (11) receiving into evidence a photograph of Lundell's body.
Galindo asserts that the sentencing panel erred in (12) considering the presentence investigation as part of weighing the aggravating and mitigating circumstances; (13) failing to receive as evidence, for purposes of the panel's proportionality review, sentencing orders from first degree murder cases where the death penalty was not imposed; (14) allowing consideration of the victim impact statements; and (15) sentencing him to electrocution, which is cruel and unusual punishment.

IV. STANDARD OF REVIEW
Statutory interpretation presents a question of law, and an appellate court resolves such issues independently of the lower court's conclusions.[6]
The retention or rejection of a venireperson as a juror is a matter of discretion with the trial court and is subject to reversal only when clearly wrong.[7]
A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse of discretion.[8]

V. ANALYSIS
We first address Galindo's challenges to L.B. 1. Galindo asserts that the State should never have charged and tried him under this statutory scheme. He argues that the previous statutory scheme, with the death penalty provisions redacted, was the law applicable to his crimes.

1. RETROACTIVE APPLICATION OF L.B. 1
Now, as at the time of the bank robbery, a defendant found guilty of first degree murder can be sentenced to death only if one of the enumerated aggravating circumstances is found.[9] Without any aggravating circumstances, the sentence is life imprisonment.[10] The ultimate decision of whether to impose the death penalty when the defendant is found "death eligible" depends on whether the aggravating circumstances outweigh mitigating circumstances, as well as a proportionality review.[11] At the time of the bank robbery, the statutory *210 scheme committed to the judge, and not a jury, both the capital sentencing factfinding of any aggravating and mitigating circumstances and the ultimate sentencing decision.[12] Approximately 3 months before the bank robbery took place, however, the U.S. Supreme Court had concluded in Ring[13] that the Sixth Amendment entitled capital defendants to a jury determination of any fact on which the Legislature conditions an increase in their maximum punishment.
After the robbery, but before Galindo's trial, the Legislature enacted L.B. 1, which did not change the nature of the statutory aggravating circumstances that make a defendant death eligible. But, it provided that the existence of any of these circumstances must be determined by a jury, instead of a judge, unless this right is waived by the defendant. Galindo was tried in accordance with L.B. 1, Galindo now argues that the imposition of the death penalty under L.B. 1 violated due process and the principles prohibiting ex post facto laws. He also argues L.B. 1 was an unlawful bill of attainder. He argues that these are issues of first impression, because in his case, the crimes were committed after Ring, but before L.B. 1.

(a) Ex Post Facto
Any statute which punishes as a crime an act previously committed which was innocent when done, which makes more burdensome the punishment for a crime after its commission, or which deprives one charged with a crime of any defense available according to law at the time when the act was committed is prohibited as ex post facto.[14] The Ex Post Facto Clause does not, however, extend to limit legislative control of remedies and modes of procedure which do not affect matters of substance.[15] Thus, statutes governing substantive matters in effect at the time of a crime govern, and not later enacted statutes.[16] In contrast, the procedural statutes in effect on the date of a hearing or proceeding govern, and not those in effect when the violation took place.[17]
A change in law will be deemed to affect matters of substance where it increases the punishment or changes the ingredients of the offense or the ultimate facts necessary to establish guilt.[18] In other words, a rule is substantive if it alters the range of conduct or the class of persons that the law punishes.[19] In contrast, rules that regulate only the manner of determining a defendant's culpability are procedural.[20]
In Ring, the U.S. Supreme Court addressed a defendant's death sentence under an Arizona statutory scheme whereby the jury adjudicated guilt of first degree murder, but for imposition of the death penalty, the judge determined the presence or absence of the enumerated aggravating factors required under the statute. The Court held that if a state makes an increase in a defendant's authorized punishment contingent on a finding of fact, *211 then such fact must be found by a jury beyond a reasonable doubt.[21] The aggravating circumstances under Arizona's statutory scheme were, the Court explained, "`the functional equivalent of an element of a greater offense'"[22] for purposes of the defendant's Sixth Amendment right to a trial by jury. Thus, because the aggravating circumstances had been found by a judge, the Court reversed the Arizona Supreme Court's decision affirming the conviction.
Because our statutory scheme, like Arizona's, committed to the judge or three-judge panel the determination of aggravating circumstances necessary to impose the death penalty, the Nebraska Legislature passed L.B. 1 to provide the right to a jury's finding of aggravating circumstances in a separate "aggravation hearing."[23] The determination of mitigating circumstances and the ultimate decision to impose the death penalty remain with the sentencing judge or three-judge panel.[24]
Galindo argues that because aggravating circumstances are the functional equivalents of an element of a greater offense, then a change in who determines whether those elements exist is a substantive and not a procedural change. This argument has already been rejected. In State v. Gales,[25] we held that the change in L.B. 1 regarding which fact finder should determine death eligibility was a procedural change and not a change in substance. In Gales, the defendant, Arthur Lee Gales, had committed first degree murder prior to both Ring and L.B. 1, but his appeal from his death penalty conviction was still pending when Ring was decided and L.B. 1 was passed. Because Gales' sentence was not yet final, we found Ring applicable, and reversed his conviction and remanded the cause for resentencing. In so doing, we rejected Gales' arguments that he could not be resentenced to death, because L.B. 1 did not exist at the time of his crime.
In concluding that the death penalty provisions of L.B. 1 were procedural in nature, we noted that L.B. 1 did not make any change to the provisions defining the aggravating or mitigating circumstances relevant to the death penalty determination. Furthermore, L.B. 1 did not change the degree of punishment, the character of the offense, or the rules of evidence. We summarized that L.B. 1, as applicable to the death penalty, in fact did nothing more than reassign from judges to juries the responsibility for determining the existence of any aggravating circumstances. It merely changed the manner of determining the defendant's culpability.[26]
In Schriro v. Summerlin,[27] the U.S. Supreme Court likewise explicitly rejected the argument that changes mandated by Ring were substantive rather than procedural. The Court explained that statutory aggravators were only "effectively"[28] elements of the offense for Sixth Amendment purposes. The aggravating circumstances were therefore "subject to the procedural requirements the Constitution *212 attaches to trial of elements."[29] However, the Court explained: "[H]olding that, because Arizona has made a certain fact essential to the death penalty, that fact must be found by a jury, is not the same as this Court's making a certain fact essential to the death penalty."[30]Ring did not "alter the range of conduct the statute punishes, rendering some formerly unlawful conduct lawful or vice versa."[31] It is a limited holding that a jury, and not a judge, must decide those facts which a state legislature had already determined to be essential to a sentence of death.
In State v. Mata (Mata I),[32] we reaffirmed our holding that L.B. 1's changes were procedural in nature. Raymond Mata, Jr., like Gales, had committed his crimes and had been tried before Ring was decided, but his appeal was still pending when Ring and L.B. 1 had passed. Unlike Gales, however, Mata had not argued to the trial court that he was entitled to a jury determination of aggravating circumstances. On appeal, we held that it was plain error to fail to have the jury determine death eligibility.
But, in State v. Mata (Mata II),[33] we rejected Mata's argument that Ring had retroactively invalidated Nebraska's capital sentencing statutes that were in effect when he committed the murder and that he was thus subject only to life imprisonment. In so doing, we discussed the U.S. Supreme Court's decision in Dobbert v. Florida.[34] In Dobbert, the defendant argued that because the Court had since declared unconstitutional the statutory methods to determine the death penalty that were in effect at the time of the defendant's crime and his trial, the state had not lawfully sentenced him to death under the original statute. Accordingly, the defendant argued that even though the changes in the new statute were procedural, they were ex post facto because they provided what did not exist before โ a constitutional procedure for imposing the death penalty. The U.S. Supreme Court opined: "[T]his sophistic argument mocks the substance of the Ex Post Facto Clause."[35] The Court's prior holding and the statutory amendment passed pursuant thereto "simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime."[36]
Galindo argues that his case is distinguishable from these cases. Galindo claims this is so because when he committed his crimes, the U.S. Supreme Court had already announced its decision in Ring. This decision, Galindo argues, immediately "invalidated"[37] the death penalty portions of Nebraska's law governing first degree murder. And since the Nebraska Legislature had not yet passed L.B. 1 when Galindo attempted to rob the bank, his crimes occurred during a brief moment when there was no death penalty *213 in Nebraska. According to Galindo, the change we must consider in our ex post facto analysis is not from the previous death penalty scheme to the modified death penalty scheme in L.B. 1, but from a scheme where the maximum punishment was life imprisonment to a scheme that included the death penalty.
While the previously discussed case law may not share the precise timing anomaly that Galindo finds so significant, we conclude it applicable nonetheless. Ring invalidated a particular procedure for determining death eligibility at trial, but it did not invalidate the death penalty.
A similar argument was addressed in dicta by the Idaho Supreme Court in State v. Lovelace.[38] The defendant in Lovelace argued that Ring invalidated the state's death penalty scheme, and the remaining valid portions, which provided for life imprisonment, became controlling until a new statute was enacted. He argued that both ex post facto and due process prohibited resentencing under the new statute enacted prior to his convictions' becoming final. In rejecting this argument, the court explained that regardless of whether the defendant committed the crime before or after Ring's pronouncement, Ring simply did not invalidate the death penalty as the maximum punishment for first degree murder. Ring invalidated nothing more than the identity of the fact finder to determine whether aggravating circumstances exist.
Galindo's underlying premise that Ring invalidated the death penalty in Nebraska is even more untenable in light of a careful observation of our death penalty statutes as they existed at the time Ring was decided. A lengthy series of statutes governed the death penalty. Neb.Rev.Stat. ง 28-303 (Reissue 1995) stated that murder in the first degree shall be punished as a Class I or Class IA felony in accordance with Neb.Rev.Stat. งง 29-2520 to 29-2524 (Reissue 1995 & Cum. Supp. 2006). Neb. Rev.Stat. ง 28-105 (Cum. Supp. 2006) stated that the maximum punishment for a Class I felony was death, while the maximum punishment for a Class IA felony was life imprisonment. Section 29-2519 (Reissue 1995) stated that it was necessary to establish mandatory standards for the imposition of the death sentence and that it should be imposed only for first degree murder in instances when the aggravating circumstances outweigh the mitigating circumstances as set forth in งง 29-2520 to 29-2524. Section 29-2523, in turn, defined the statutory aggravating and mitigating circumstances applicable in determining whether the death penalty should be imposed. And Neb.Rev.Stat. งง 29-2521.01 to 29-2521.04 (Reissue 1995 & Cum. Supp. 2006) expressed the policy that the death penalty should not be imposed arbitrarily and set forth the procedure for automatic appeal to our court.
Of all the statutes composing our death penalty scheme and referring to the death penalty as the maximum punishment for first degree murder, only one, ง 29-2522, dealt with who should make the determination of the aggravating circumstances. Thus, only ง 29-2522 violated the principles of jury factfinding set forth by Ring. It would have been unreasonable to conclude that Ring called into question the remaining provisions of the Nebraska death penalty scheme. The invalidity of a single provision purely procedural in nature does not automatically invalidate the underlying punishment to which that procedure applies.
Our conclusion that Ring did not invalidate the death penalty is consistent with *214 our reasoning in Mata II.[39] In that case, we invalidated electrocution as the method of imposing the death penalty. We were thus faced with whether Mata's sentence of death could stand under a scheme that, as of that moment, had no constitutional means of carrying out the sentence. We affirmed the death penalty as the maximum punishment under Nebraska law. We reasoned that the statutes specifying the mode of inflicting the death penalty were separate and severable from other provisions of the death penalty scheme. Therefore, despite the fact that there was no constitutional means to carry out a death sentence, the sentence itself was not invalid. Similarly, despite the fact that during the months between Ring and L.B. 1, there was no constitutional procedure to determine death eligibility in a trial for first degree murder, it does not follow that Nebraska law no longer provided for the death penalty as the maximum punishment at the time of Galindo's crimes. Section 29-2522, which listed the judge or three-judge panel as the fact finder for aggravating circumstances, was separate and severable from the remaining statutes pertaining to the death penalty scheme.

(b) Due Process
Invoking due process principles, Galindo argues that the citizenry was on notice at the time of his crime that Ring had removed the death penalty from Nebraska law and that the Legislature had chosen not to reenact capital punishment. Based on the above discussion, we find no merit to this argument.
Galindo's principal due process argument, however, stems from Coleman v. McCormick,[40] a case considering whether a defendant was given a fair opportunity to defend the relevant issues at trial. In Coleman, the court held that the state's retroactive application of procedural changes to the death penalty statute violated fundamental principles of procedural due process.
The defendant in Coleman was originally tried and convicted under a statute which provided for a mandatory death sentence whenever the defendant was found guilty of aggravated kidnapping. On appeal, the state supreme court held the law was unconstitutional, because it did not allow the trial court to consider any mitigating circumstances. It remanded the cause with directions to resentence in accordance with a new statute enacted in the interim, which listed aggravated kidnapping as an aggravating circumstance. The new law also provided for the consideration of mitigating circumstances upon review of the trial record. Without a new trial on guilt, the court on remand reviewed the trial record and again sentenced the defendant to death. The Ninth Circuit Court of Appeals held that resentencing deprived the defendant of procedural due process, because the defendant did not know at the time he put on his defense in trial that the evidence would later be used to determine mitigating circumstances. The court explained:
The defendant is due at least that amount of process which enables him to put on a defense during trial knowing what effect such a strategy will have on the subsequent capital sentencing, the results of which may be equally if not more critical to the defendant than the conviction itself.[41]
Because the defendant "made countless tactical decisions at trial aimed solely at *215 obtaining [his] acquittal, without even a hint that evidence ... would be considered as either mitigating or aggravating factors,"[42] the due process violation was pervasive and not harmless error, and the court vacated the defendant's death sentence.
Even assuming the Ninth Circuit Court of Appeals was correct in categorizing the legislative change in that case as merely procedural in nature, we find Coleman to be wholly inapplicable to the case at bar. When Galindo was tried, he was given fair notice of both the aggravating and mitigating circumstances to be weighed in the panel's sentencing decision. The State amended the information to advise Galindo it was proceeding under L.B. 1 a year before his trial. We find no merit to Galindo's due process arguments against the application of L.B. 1.

(c) Bill of Attainder
Galindo alternatively argues that L.B. 1, and the death penalty, cannot be applied against him because L.B. 1 constitutes a bill of attainder. Galindo asserts L.B. 1 was enacted as a direct response to the Norfolk killings and was thus "`improperly motivated,'"[43] in violation of U.S. Const. art. I, ง 10 ("[n]o State shall ... pass any Bill of Attainder"), and Neb. Const. art. I, ง 16 ("[n]o bill of attainder... shall be passed").
Only the clearest proof suffices to establish the unconstitutionality of a statute as a bill of attainder.[44] A bill of attainder is a legislative act which applies to named individuals or to easily ascertained members of a group in such a way as to inflict punishment on them without a judicial trial.[45] The bill of attainder provision prohibits trials by a legislature, and it forbids the imposition of punishment by the legislature on specific persons.[46] Stated differently, it proscribes legislation which singles out disfavored persons and carries out summary punishment for past conduct.[47] The bill of attainder clause was intended as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function.[48] It reflected the framers' belief that the legislative branch is not so well suited as are politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.[49]
L.B. 1 is not a bill of attainder. By its terms, L.B. 1 does not focus on any particular person or persons, but is properly focused on prohibited conduct applicable equally to everyone. We also note that, in reality, L.B. 1 did not "inflict punishment" at all โ in the sense that it did not inflict anything differently against anyone than had been the case before.
Galindo's principal argument that L.B. 1 is a bill of attainder is that the particular timing of its passage was spurred by the occurrence of the bank robbery. Even if true, we find this to be of no consequence. In order for a legislative *216 enactment to be deemed a bill of attainder, it must (1) specify the affected persons, (2) inflict punishment, and (3) lack a judicial trial.[50] L.B. 1 does not qualify as a bill of attainder under any of these criteria.

2. L.B. 1 AS UNCONSTITUTIONAL SCHEME
Galindo also presents various facial challenges to L.B. 1. These arguments have largely already been addressed by our court in State v. Hessler,[51] and we conclude they have no merit.

(a) Inducement to Waive Jury Finding of Aggravators
Galindo asserts that under the principles announced in United States v. Jackson,[52] L.B. 1 presents an unconstitutional inducement to waive his right to a jury finding of aggravating circumstances. Specifically, Galindo asserts that the most accurate weighing of aggravating against mitigating circumstances can only be achieved when the same entity making the sentencing determination has heard all of the evidence relevant to the finding of aggravating circumstances. Because the other two judges of the sentencing panel do not preside over a jury aggravation hearing, exercise of that right results in two judges being less informed than they would have been had Galindo waived the jury findings of aggravating circumstances. Galindo also complains that only when a judicial panel makes the finding of aggravating circumstances does the statutory scheme require written, unanimous findings of the facts supporting the determination.
In Jackson, the U.S. Supreme Court found unconstitutional a federal statutory provision that permitted capital punishment only when the defendant was tried by a jury and the jury recommended the death sentence. If the defendant waived the right to a jury trial or pled guilty, then the maximum punishment was life imprisonment. The Court held that the statute improperly coerced or encouraged the defendant to waive the Sixth Amendment right to a jury or the Fifth Amendment right to plead not guilty and that it needlessly penalized the defendant who asserted such rights.
The argument that L.B. 1, like the scheme considered in Jackson, penalizes a defendant's exercise of the right to have a jury finding of aggravating circumstances was recently rejected in Hessler.[53] We concluded that the Nebraska death penalty scheme "does not improperly coerce or encourage a defendant to waive his or her right to a jury and does not penalize a defendant who asserts such right."[54] Unlike the provision in Jackson, whereby the defendant could completely avoid the death penalty by waiving a jury trial, "[u]nder the Nebraska statutes, there is no such direct benefit achieved at the expense of waiving the right to a jury ...."[55]
In particular, we explained that "[w]hile the sentencing panel might be more thoroughly versed about the case if it had also found aggravating circumstances, this does not mean that the sentencing panel *217 would necessarily make a sentencing decision that was more favorable to the defendant."[56] And we similarly found no constitutional significance to the fact that the jurors are not required to unanimously agree on every factual predicate that may have led to their (unanimous) finding of an aggravating circumstance.
Galindo attempts to illustrate that when the jury determined the Norfolk murders were especially heinous, atrocious, cruel, or manifested exceptional depravity, he had no way of knowing, based on the instructions given to the jury, whether the jury based its decision on findings of the victims' mental anguish or on the conclusion that Galindo relished the murders. But Galindo fails to explain how such specific knowledge would be useful to him. The U.S. Supreme Court in Schad v. Arizona[57] explained there is no constitutional mandate that the underlying facts of the crime be unanimously agreed upon by the jury: "`[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly, there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.'" We find no reason to reconsider our decision in Hessler, and we conclude that whatever advantage written factual findings by the jury might provide, it is a far cry from the advantage considered unconstitutional in Jackson.

(b) Ability to Effectively Weigh Aggravating Circumstances and Admissibility of Record From Aggravation Hearing
Galindo's next argument is that L.B. 1 is unconstitutional because it provides for no means by which the nonpresiding judges of the sentencing panel can properly weigh the aggravating circumstances found by a jury against the mitigating circumstances found by the panel. Galindo comes to this conclusion after strictly reading L.B. 1 so as to prohibit the panel's consideration of the record from the aggravation hearing. Thus, Galindo argues it was error for the panel in his trial to receive the aggravation record. At the same time, Galindo asserts it is impossible for the panel to weigh the aggravating circumstances against mitigating circumstances unless the aggravation record is considered. In sum, Galindo seeks to create a Catch-22 that would place the statutory scheme in violation of due process. We have already held, in Hessler, that the record from the aggravation hearing is admissible. Thus, there is no "unworkable"[58] scheme.
Section 29-2521(3) states that if the jury has determined the aggravating circumstances, then the panel must next hold a hearing to determine any mitigating circumstances. And at that hearing, the panel may receive "any matter that the presiding judge deems relevant to (a) mitigation, including, but not limited to, the mitigating circumstances set forth in section 29-2523, and (b) sentence excessiveness or disproportionality as provided in subdivision (3) of section 29-2522."[59] Galindo's argument is that the aggravation hearing record is not "relevant" to mitigation, sentence excessiveness, or disproportionality and that its consideration is therefore prohibited by L.B. 1.[60]
Galindo's strained attempt to demonstrate an unconstitutional scheme *218 runs contrary to our rules of statutory construction that afford a presumption of constitutionality to legislative enactments. Also, we give statutes a sensible construction in light of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served.[61] In Hessler, we said: "[T]he death penalty statutes read as a whole make clear that the sentencing panel needs to consider evidence of the crime and of aggravating circumstances in order to properly perform its balancing and proportionality sentencing functions."[62] Moreover, we noted that under ง 29-2522, the sentencing panel is required to "`consider[] both the crime and the defendant'"[63] in determining whether aggravating circumstances justify imposition of a death sentence, whether mitigating circumstances exceed or approach the weight of aggravating circumstances, and whether a death sentence is excessive or disproportionate to the penalty imposed in similar cases. We explained in Hessler that the records of the guilt and aggravation phases of the trial clearly have probative value regarding the crime and the defendant.
Galindo makes a further attempt at his Catch-22 by asserting that the aggravation hearing record was inadmissible because it violated his right to confrontation. The Sixth Amendment to the U.S. Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him," and the main and essential purpose of confrontation is to secure the opportunity of cross-examination.[64] Galindo was in fact given the right to confront all the witnesses during the guilt and aggravation phases of his trial, and thus, as a threshold matter, it does not appear that the Confrontation Clause is implicated by receipt of the trial record. Also, as will be discussed in further detail below, we have held that the right to confrontation is not applicable to the sentencing phase of a criminal trial.[65] Although a defendant is entitled to due process upon sentencing, the U.S. Constitution does not require that he or she be given the full panoply of rights accorded when the issue is guilt or innocence.[66]
We conclude that Galindo has failed to demonstrate that the record from the aggravation hearing was inadmissible. And we find no merit to Galindo's attacks on L.B. 1 that revolve around the sentencing panel's consideration of the record from the aggravation hearing.

3. NOTICE OF AGGRAVATION
As an alternative to his argument that he should not have been charged and tried under L.B. 1, Galindo argues that the information against him was defective because it failed to comply with L.B. 1. Galindo argues that L.B. 1 demands that the original information contain a notice of aggravation, and that, as his did not, he cannot be sentenced to death.
The original information against Galindo did not contain a notice of aggravation because, at the time it was filed, the statutory scheme did not require such notice. *219 An amended information containing the required notice of aggravation under the newly enacted Neb.Rev.Stat. ง 29-1603(2)(a) (Reissue 2008) was filed the same day that L.B. 1 was enacted.
Leaving aside whether Galindo correctly interprets ง 29-1603, we observe that Galindo is demanding strict compliance with a procedural rule before it even existed. We apply our reasoning in Mata I[67] and Gales,[68] wherein we remanded the cause for resentencing under L.B. 1, despite the fact that the information against the defendants did not contain a notice of aggravation. The notice of aggravation is a procedural rule, and while procedural statutes do apply to pending litigation, it is a general proposition that "new procedural statutes have no retroactive effect upon any steps that may have been taken in an action before such statutes were effective.... All things performed and completed under the old law must stand."[69] We find no error stemming from the fact that the original information did not contain a notice of aggravation.

4. JURY
Having established that Galindo was properly charged under L.B. 1, we turn next to Galindo's argument that he was not tried by a fair and impartial jury. Galindo's pretrial motions for change of venue were denied. Galindo alleges that the scale of the crimes, the publicity, and the relatively small population of the county where the crimes occurred made it impossible for him to be tried fairly there. Galindo claims, due to these difficulties, the trial court improperly tried to influence the venire in order to obtain jurors who would state their willingness to be impartial. Galindo also claims the trial court refused to excuse for cause many jurors who had demonstrated they could not be fair and impartial.

(a) Alleged Inappropriate "Pep Talk" to Jury
Galindo argues that the judge made inappropriate comments to the venire prior to the individual voir dire. He alleges that these comments were designed to convince jurors who did not want to be on the jury panel to sit, and he alleges that jurors were clearly influenced by the comments. According to Galindo, the trial court's comments violated his right to due process and a fair trial.
Prior to examination of the 71 potential jurors, the trial judge made the following remarks:
Before we get started, I'd like to make a few comments about jury duty generally. Many times we just show a video; I'm not going to show a video today of the trial process. This is a bit of a unique trial, but I just want to talk to you generally about jury duty.
I believe that some people perceive jury duty as being an inconvenience and an imposition in their work and daily lives. Some see it as a sacrifice that they are unwilling to make and find ways to seek to avoid jury service.
However, the greatest sacrifice was made by this country's founding fathers who by the 6th Amendment to the U.S. Constitution established the right of the accused to a trial by a jury of his or her peers and by the fighting men and women of our armed forces who have maintained that right since 1791.
There was an article that appeared in the Omaha World Herald a few years ago. It was written by an individual by *220 the name of Phillip Bissett who was a former member of the House Judiciary Committee of the Maryland General Assembly. I think that this is instructive and it gives a good insight into jury duty responsibility. It was written for Memorial Day, but I think it has meaning for any of us this day or any other day, and I'd like to read a portion of that article to you.
... Bissett states, "The right to a trial by jury after all is one of the fundamental freedoms that Americans have fought and died for since the founding of our Republic. In a nation ruled by laws, not tyrants, jury duty ought to be considered a sacred obligation. Serving on a jury is one of the most important ways every American can serve his," and I'll add "or her country. Our justice system depends on citizens who answer the call of jury service. When you are selected to serve on a jury, you become an active participant in insuring fair and balanced justice in your community. Citizens with doubts about jury service should consider the words of Thomas Jefferson, `The jury is the only anchor ever yet imagined by man by which a government can be held to the principles of its Constitution. The jury is the ultimate safeguard of our civil rights.' The American fighting men and women died safeguarding our civil rights. We dishonor their memory by not fulfilling the civil responsibilities that go hand in hand with those civil rights. If you're called to serve on a jury this year, remember it's far from the ultimate sacrifice. Step forward with pride and serve. It's a chance to participate in democracy that most of the world's 6.3 billion people would love to have."
Galindo's counsel did not object to these comments at the time they were made. On the third day of voir dire, however, Galindo's counsel objected to the comments as denying his right to select a fair jury. The court overruled the objection, explaining that "[d]ifferent judges have different introductory comments .... I see nothing that prohibits that ...." The judge further explained that the comments were simply an instruction on juror responsibility.
Assuming Galindo's objection was timely made,[70] we agree with the trial court. Galindo points out the proposition that "trial courts should refrain from commenting on evidence or making remarks prejudicial to a litigant or calculated to influence the minds of the jury."[71] But it is absurd to imply that the trial judge is prohibited from influencing the jury in any manner whatsoever.
In State v. Bjorklund,[72] we held that the trial judge did not violate the defendant's right to due process and a fair trial when the judge told the jury before deliberations, "`God be with us.'" We explained:
The trial judge made no comment on the evidence, the law, or the defendant, and, as noted in the reviewing judge's findings, the jurors did not interpret his words as such. The phrase "God be with us" did not enhance the credibility of any witness, serve as an instruction on reasonable doubt, or in any way suggest *221 to the jurors what an appropriate verdict would be in this case.[73]
Thus, it is clear that the influence prohibited is of a nature that encroaches upon the juror's role as the fact finder and arbiter of guilt. We conclude that the trial judge's comments to the venire for Galindo's trial were not inappropriate.
Furthermore, we find nothing prejudicial in judicial commentary about the importance of jury duty in our judicial system. To establish reversible error, a defendant must demonstrate that a trial court's conduct, whether action or inaction during the proceeding against the defendant, prejudiced or otherwise adversely affected a substantial right of the defendant.[74] As the court explicitly stated, the comments were directed at the possible attitude that jury duty is an inconvenience. To dissuade a potential juror from such an attitude is of equal benefit to the defendant as it is to the State. Neither Galindo's right to due process nor his right to a fair trial was violated by the trial judge's comments on jury duty.

(b) Failure to Strike Jurors for Cause
Galindo argues that numerous jurors from the venire should have been stricken from the jury for cause because they had already formed an opinion of Galindo's guilt. However, of the 19 jurors that Galindo argues should have been stricken for cause, only jurors Nos. 65 and 38 actually sat after the parties had exhausted their peremptory strikes. We have explained that even the erroneous overruling of a challenge for cause will not warrant reversal unless it is shown on appeal that an objectionable juror was forced upon the challenging party and sat upon the jury after the party exhausted his or her peremptory challenges.[75] Therefore, in determining whether the trial court committed reversible error in failing to strike the challenged jurors for cause, we consider only jurors Nos. 65 and 38.
Galindo's brief does not specifically discuss these two jurors, and he focuses instead on several jurors who were ultimately removed by peremptory challenge. Galindo simply cites to juror No. 65 as one of the "[m]any jurors [who] expressed an opinion that [Galindo] was guilty, but were asked to set that aside."[76] He then cites to juror No. 38 as one of the "[o]ther jurors [who] indicated that they could not be fair or impartial, but were asked to set that aside."[77] For the sake of completeness, we examine these jurors in more detail.
Juror No. 65 had some acquaintance with victims of the robbery. She used to work with Tuttle, Koepke, and Sun's exwife. She knew Cahoy because they were both from the same Nebraska town. Juror No. 65 remembered seeing Mausbach when she was a customer of the bank. Finally, juror No. 65's mother-in-law lived next door to the family that was held at gunpoint by Galindo in order to steal a getaway car.
*222 Nevertheless, juror No. 65 had no knowledge of the case based on any discussions with surviving victims or their families. She stated that she had not gone to any of the funerals or memorial services for any of the victims. Juror No. 65 indicated that there was nothing about her relationship with any of these persons that would preclude her from taking an oath to sit as a fair and impartial juror and decide the case solely on the evidence presented during trial.
When asked about pretrial publicity, juror No. 65 stated she had read about the case in a newspaper and "[t]here's the appearance that [Galindo] was involved." Nevertheless, she repeatedly affirmed that she would judge Galindo based solely on the evidence presented at trial.
Juror No. 38 also had some acquaintance with a family member of one of the victims. Juror No. 38 worked with Bryant's husband for approximately 8 months after the shootings. Juror No. 38 explained that he saw Bryant's husband at work somewhat regularly, but there was no indication from the questioning of juror No. 38 that they were particularly close. Juror No. 38 stated that he never spoke with Bryant's husband about the robbery. As a customer of the bank, juror No. 38 was also acquainted with Cahoy, and he had gone to high school with the daughter of the woman Galindo had taken the car keys from. He did not attend any of the funeral or memorial services for the victims.
Juror No. 38 had stated in his questionnaire that he was not "sure" whether he could be impartial. In the beginning of voir dire, juror No. 38 reaffirmed this uncertainty. After the process was explained in more detail, however, he stated he believed he could put aside any feelings and opinions and presume Galindo innocent until proved otherwise. Juror No. 38 explained that the way his questionnaire had been worded, he was not sure, "but the way it's been explained today, I believe that I could base a verdict on evidence provided." Juror No. 38 admitted he had read many newspaper articles about the crime and had formed the opinion that Galindo was guilty. Nevertheless, he stated, "I've been instructed to put aside those feelings and I believe I can do that."
While Neb.Rev.Stat. ง 29-2006(2) (Reissue 1995) states that good cause to challenge a juror includes that he or she has formed or expressed an opinion as to the guilt or innocence of the accused, it also states that if the opinion was formed based on "reading newspaper statements, communications, comments or reports, or upon rumor or hearsay," then the potential juror may serve if he or she says "on oath that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence" and if the court is satisfied that the potential juror is in fact "impartial and will render such verdict." Only if the juror's opinion was formed based upon "conversations with witnesses of the transactions or reading reports of their testimony or hearing them testify" is dismissal of the juror for cause mandatory.[78] There is no evidence that jurors Nos. 65 and 38 had formed their opinions based on conversations with witnesses of the transactions or reading or hearing their testimony, and the trial judge determined that the jurors were being truthful when they stated under oath that they could be impartial.
The mere fact that a prospective juror is personally acquainted with the victim or the victim's family does not automatically disqualify a person from sitting *223 on a criminal jury.[79] Only when it appears that they cannot or will not put aside the relationship with the victim and render impartial verdicts based solely on the evidence need jurors be excused for cause.[80] The inquiry in ruling on a motion to strike a prospective juror for cause is whether the conditions behind a juror's familiarity with a party, victim, attorney, or witness are such that those connections would probably subconsciously affect his or her decision of the case adversely to the defendants; however, this does not encompass a mere social acquaintanceship in the absence of other indicia of a relationship so close as to indicate the probability of partiality.[81] There is no evidence in this case that jurors Nos. 65 and 38 had such a close relationship with any of the victims or their families.
The law does not require that a juror be totally ignorant of the facts and issues involved in the case; it is sufficient if the juror can lay aside his or her impression or opinions and render a verdict based upon the evidence.[82] For the reasons discussed above, neither juror No. 65 nor juror No. 38 was subject to mandatory disqualification. Thus, their retention or rejection was a matter of discretion with the trial court that is subject to reversal only when clearly wrong.[83] Our review of the voir dire does not reveal error in the trial court's judgment that jurors Nos. 65 and 38 could be fair and impartial.
Juror No. 65's statement that "[t]here's the appearance that [Galindo] was involved" barely rises to an opinion of guilt. This statement does not call into question juror No. 65's later affirmation that she could render an impartial verdict upon the law and the evidence. Juror No. 38's doubts likewise do not lead us to the conclusion that the trial court was clearly wrong in believing juror No. 38's affirmation that he could set aside personal opinions and consider only the evidence at trial.
If the voir dire examination of a juror considered as a whole does not show bias or partiality, a challenge upon that ground is properly overruled, although during his or her examination statements are made which, if unexplained, might have been a ground for challenge.[84]
We defer to the trial court's judgment on a motion to strike for cause, because the trial court is in the best position to assess the demeanor of the venire and of the individuals who compose it.[85] As explained by the U.S. Supreme Court:
[T]he manner of the juror while testifying is oftentimes more indicative of the *224 real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.[86]
We are not insensitive to the issues of the personal connections of the community and the pretrial publicity in this case. These factors may have made the trial judge's task more challenging. But we conclude that the task was, in the end, successfully accomplished. There is nothing in the record of this case to indicate that the jurors who ultimately sat on Galindo's trial were anything but fair and impartial.

(c) Venue
Of course, Galindo's challenge to the trial court's failure to strike jurors for cause is intertwined with his belief that a fair jury simply could not be found in Madison County. He alleges that under Irvin v. Dowd,[87] we must assume partiality of the Madison County jury as a matter of law, no matter how sincere the jurors were when they pledged to be impartial. Galindo asserts he was denied his rights to due process, a fair trial, and an impartial jury, because the trial court denied his request for a change of venue. Although we have set out factors for determining whether to grant a motion for change of venue, Galindo does not specifically rely on these factors. Instead, Galindo makes a twofold argument. First, he contends that pretrial publicity was pervasive and prejudicial. Second, he contends that the statements of potential jurors showed that voir dire was insufficient to protect his rights to a fair and impartial jury. A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse of discretion.[88] A trial court abuses its discretion in denying a motion to change venue when a defendant establishes that local conditions and pretrial publicity make it impossible to secure a fair and impartial jury.[89]
We have held that voir dire examination provides the best opportunity to determine whether a court should change venue.[90] But Galindo asserts that the "`"pattern of deep and bitter prejudice"'"[91] against him in Madison County mandated a change of venue, no matter what the jurors stated in voir dire.

(i) Pretrial Publicity
We have stated that under Irvin,[92] "`adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed.'"[93] But "juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged [does not] alone presumptively deprive[] the defendant of due process."[94] "Partiality may be presumed *225 only in situations where `the general atmosphere in the community or courtroom is sufficiently inflammatory.'"[95]
A court will normally not presume unconstitutional partiality because of media coverage, unless the record shows a "`barrage of inflammatory publicity immediately prior to trial,' ... amounting to a `huge ... wave of public passion'"[96] or resulting in "a trial atmosphere... utterly corrupted by press coverage."[97] The quantum of news coverage is not dispositive. Even the community's extensive knowledge about the crime or the defendant through pretrial publicity is insufficient in itself to render a trial constitutionally unfair when the media coverage consists of merely factual accounts that do not reflect animus or hostility toward the defendant.[98] Although we have frequently stated that the defendant must show pervasive, misleading pretrial publicity, the more important consideration is whether the media coverage was factual, as distinguished from "invidious or inflammatory."[99]
In Irvin, publicity against the defendant included prejudicial details of his criminal record over the course of the previous 20 years. The publicity detailed the fact that the defendant had failed a lie detector test and had confessed not only to the murder charged, but to five other murders and 24 burglaries committed around the same time. He was portrayed as a "`confessed slayer of six,'" "remorseless and without conscience," a parole violator, and fraudulent check artist.[100] Dramatic newspaper articles portrayed law enforcement pledges to see him punished and explained that defense counsel had no choice but to defend his client. Of a panel of 370 potential jurors, almost 90 percent entertained some opinion as to the defendant's guilt. Two-thirds of the venire were aware of the other murders attributed to the defendant.[101] Eight out of twelve of the jurors finally placed in the jury box thought the defendant was guilty โ although they all stated under oath they could set aside that preconception.
The Court concluded that under these circumstances, "accounting for the frailties of human nature," "it would be difficult to say that each [juror] could exclude this preconception of guilt from his deliberations."[102] Therefore, the trial court's finding of impartiality did not meet constitutional standards and the conviction in the venue where the crime occurred was void.[103]
In support of an allegedly similar deep and bitter prejudice against him in *226 Madison County, Galindo points to the extensiveness of the publicity. But in contrast to the facts in Irvin, much of the publicity Galindo complains of is the same publicity that we found insufficient to mandate a change of venue for Rodriguez' trial. In State v. Rodriguez,[104] we explained that while the media coverage was indeed "extensive," it consisted mostly of factual accounts. We noted that Rodriguez did not contend that the coverage displayed any hostility or animosity toward him. Since the time of Rodriguez' trial, the media has generated more publicity, but the nature of the publicity has not significantly changed. It remains largely factual, and none of the pretrial publicity revealed evidence inadmissible for the jury's consideration at trial. Press coverage which is factual in nature cannot serve as the basis for a change of venue.[105]
Like Rodriguez, Galindo does not argue that the publicity displayed animus or hostility toward him. This is distinct from Irvin, where pretrial publicity made it impossible to obtain a fair trial in the venue where the crime was committed. The relevant question is not whether the potential jurors knew about the case but whether they "had such fixed opinions that they could not judge impartially the guilt of the defendant."[106] We do not believe that the media coverage was the type that would have inflamed public passion against him or corrupted the trial atmosphere such that the trial judge should have presumed prejudice for any potential juror. Nor do we believe that the jurors' statements during voir dire reflected such a widespread hostility toward Galindo that prejudice should have been presumed.

(ii) Jurors' Statements
Galindo also alleges that the juror questionnaires and the voir dire demonstrate a pervasive, biased community sentiment against him. In evaluating the reliability of jurors' statements that they can be impartial, another relevant consideration is whether most of the venire members have stated that they cannot be impartial. In Murphy v. Florida,[107] the U.S. Supreme Court, discussing Irvin, where nearly 90 percent of the venire members stated that they could not be fair and impartial, concluded:
In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it.
But here, less than 29 percent of the jury pool members stated in the questionnaire that they did not believe they could be impartial. In contrast, almost 60 percent believed they could be impartial. Similarly, of the 71 of the venire members, 21 (about 29ฝ percent) were excused because they maintained their belief that they could not be fair and impartial. But these venire members did not represent "most" of the venire, and these numbers fell far short of the 90 percent of venire members in Irvin who could not set aside their prejudice. We conclude that the jurors' statements, taken as a whole, were insufficient to show that the court should have presumed the jurors would be *227 affected by community partiality despite their statements to the contrary.

(iii) Size of Community
Lastly, Galindo argues that the small size of the community, in relation to the large scale of the crime, mandated a change of venue. Galindo complains that because of the size of the city and the fact that the murdered bank tellers worked with the public, many potential jurors had some direct or indirect acquaintance with at least one of the victims. But this is not enough to assume prejudice under Irvin.[108] To the extent voir dire revealed a relatively small degree of separation between the victims and the community, we find nothing in the record that calls into question the analysis already set forth above that the jury ultimately selected was fair and impartial. To hold otherwise would mandate a change of venue anywhere the community is relatively small in proportion to the crime or the number of victims. But neither the Fifth nor the Sixth Amendment demands or even contemplates a jury of strangers.[109] A serious case will tend to draw most of the public's attention in any size community, and absent particular evidence of the community's inability to put on a fair trial, such inability will not be presumed simply because of the community's size and the relationships among its people.
We find no merit to Galindo's argument that the failure to grant his motion for change of venue denied him his right to a trial before a fair and impartial jury.

(d) "Life Qualifying" the Venire
Galindo next asserts that due process and the prohibition against cruel and unusual punishment were violated when the trial court denied his request to "`life qualify'" the venire.[110] Specifically, Galindo sought to inquire whether any of the potential jurors would automatically impose the death penalty in every first degree murder case. In denying the request, the trial court reasoned that Nebraska's sentencing scheme provides that the judge, not the jury, is to determine whether the death sentence will be imposed. Galindo argues that even though the jury does not impose the ultimate sentence, those jurors who believe in imposing the death sentence in all circumstances would vote to find an aggravator, despite the evidence.
Generally, the extent to which parties may examine jurors as to their qualifications rests largely in the discretion of the trial court, the exercise of which will not constitute reversible error unless clearly abused, and where it appears that harmful prejudice has been caused thereby.[111] But Galindo relies on Morgan v. Illinois,[112] wherein the U.S. Supreme Court held that the defendant had the constitutional right to inquire if any of the prospective jurors would always impose the death penalty following a conviction of first degree murder. We find Morgan distinguishable from the present case.
Central to the Court's decision in Morgan was the fact that Illinois had chosen to delegate to the jury the task of *228 weighing the aggravating circumstances against mitigating circumstances and to determine whether the penalty of death should be imposed. The Court said that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the juror's instructions and oath.[113] Under this standard, the Court explained: "[A] juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause."[114] Stated another way, a juror who would impose the death penalty in all situations regardless of the weighing process is "announcing an intention not to follow the instructions" that he or she "consider" all the mitigating factors supported by the evidence.[115]
The Court explained that it thus followed that "[w]ere voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless ...."[116] Despite the fact that voir dire is generally left to the discretion of the trial judge, the Court explained that the trial court's judgment was "'subject to the essential demands of fairness.'"[117] The Court concluded that these essential demands of fairness mandate that a defendant on trial for his or her life be permitted on voir dire to ascertain whether a prospective juror holds a belief that "reflects directly on that individual's inability to follow the law."[118]
In Nebraska, unlike in Illinois, jurors' beliefs regarding whether all first degree murderers should be sentenced to death do not reflect directly on their ability to follow the law. This is because juries in Nebraska do not make the ultimate sentencing determination. While it might be permissible to allow the type of questioning that Galindo wished to conduct, it is not mandated by the principles of fundamental fairness that limit the trial court's discretion in governing voir dire. We cannot conclude that the trial court abused its discretion in denying Galindo's request to "life qualify" the venire.

(e) Minimizing Jurors' Role in Death Penalty Determination
Galindo argues that in addition to refusing his request to life qualify the venire, the trial court handicapped the jury's ability to do its duty by minimizing its role in determining Galindo's sentences. Galindo asserts that the trial court's standard death qualification question violated his rights to due process and a fair trial and the right against cruel and unusual punishment. That question was as follows:
Now, ... Galindo is charged with first degree murder. Under Nebraska law if a person is found guilty of first degree murder, death is one of the possible penalties. If ... Galindo is found guilty of first degree murder, a panel of three judges will determine his sentence, not the jury. Knowing that a panel of judges, not the jury, must determine the sentence, do you have any personal beliefs which would prevent you from making *229 a finding of guilty of first degree murder even if the evidence supports such a finding?
We conclude that there is no constitutional violation stemming from this statement.
According to Galindo, the trial court's statement is analogous to commentary considered impermissible by the U.S. Supreme Court in Caldwell v. Mississippi.[119] Under Mississippi law at the time of the Caldwell decision, the jury in first degree murder cases made the ultimate sentencing determination. During closing arguments for the defendant's trial, the prosecution attempted to rebut defense counsel's argument that the defendant's life was in the jury's hands and that it had a solemn responsibility in determining whether to impose the death penalty. The prosecution responded that defense counsel was very "`unfair'" to imply that it would be the jury putting the defendant to death, explaining, "'[Y]our decision is not the final decision.... Your job is reviewable.'"[120] The trial court overruled defense counsel's objection to this line of argument, and the prosecution continued to explain to the jury that all death penalty determinations were automatically reviewed by the justices of the state supreme court.
The U.S. Supreme Court held that the prosecution's argument to the jury violated the defendant's Eighth Amendment rights. The Court held that the Eighth Amendment prohibits the imposition of a death sentence by a sentencer "who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."[121] "[C]apital sentencers," the Court explained, should instead "view their task as the serious one of determining whether a specific human being should die at the hands of the State."[122]
Moreover, the Court explained that "[i]n the capital sentencing context there are specific reasons to fear substantial unreliability as well as bias in favor of death sentences when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court."[123] The Court concluded that "[b]ias against the defendant clearly stems from the institutional limits on what an appellate court can do โ limits that jurors often might not understand."[124] The Court summarized:
The "delegation" of sentencing responsibility that the prosecutor here encouraged would thus not simply post-pone the defendant's right to a fair determination of the appropriateness of his death; rather it would deprive him of that right, for an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance....
....
... But for a sentencer to impose a death sentence out of a desire to avoid responsibility for its decision presents the specter of the imposition of death based on a factor wholly irrelevant to legitimate sentencing concerns. The death sentence that would emerge from such a sentencing proceeding would simply not represent a decision that the *230 State had demonstrated the appropriateness of the defendant's death.[125]
The U.S. Supreme Court, however, has since clarified Caldwell as follows:

Caldwell [is] "relevant only to certain types of comment โ those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." ... Thus, "[t]o establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law."[126]
The prosecution's commentary to the jury in Caldwell is clearly distinct from the commentary by the trial judge in Galindo's voir dire. Most fundamentally, as the trial court noted, the jury in Galindo's trial was not the "sentencer." Based on the trial judge's statement, there could be no "false belief" that responsibility for determining the appropriateness of the death sentence rests elsewhere, because that decision does lie elsewhere.
Nor did the commentary influence the jury to "shift its sense of responsibility" in its function of determining death eligibility. The commentary complained of here occurred prior to trial as part of the jury selection process. The trial judge was simply trying to ascertain whether, despite the fact that the panel, and not the jury, would determine the ultimate sentence, any of the potential jurors would be unable to find Galindo guilty because he might be put to death based on such a verdict.[127] While the death qualification question did not inform the jury at that time that it would be charged with finding aggravating circumstances, this was deliberate. As required by ง 29-1603(2)(c), the existence or content of the notice of aggravation was not disclosed to the jury prior to the return of the guilty verdicts. Section 29-1603(2)(c) states that "[t]he existence or contents of a notice of aggravation shall not be disclosed to the jury until after the verdict is rendered in the trial of guilt." Thus, the narrowness of the information revealed to the potential jurors during voir dire was an attempt to avoid unduly prejudicing the jury against Galindo during the guilt phase of the bifurcated trial.
By the time of the aggravation hearing, the nature of the jury's responsibility was fully explained. The jury was instructed: "Aggravating circumstances are reasons why [Galindo] may be sentenced to death" and "[i]f no aggravating circumstance is found to exist, the court shall enter a sentence of life imprisonment." While the jury was also informed that the three-judge panel determined Galindo's ultimate sentence, this unavoidable knowledge did not inaccurately diminish the jurors' sense of responsibility or interject irrelevant concerns. And certainly, unlike the concern over the jurors' knowledge of the confines of appellate review considered in Caldwell, there was no danger of the jury misunderstanding precisely what a three-judge panel does.
Voir dire is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound *231 discretion.[128] "The Constitution, after all, does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury."[129] We find no constitutional violation stemming from the trial court's death eligibility questions.

5. ENMUND/TISON
We turn now to a cluster of arguments made by Galindo pertaining to the U.S. Supreme Court's decisions in Enmund v. Florida[130] and Tison v. Arizona.[131] The Enmund/Tison rulings address accomplice liability for felony murder and the constitutional mandate that in capital cases, the punishment be tailored to both the nature of the crime and the defendant's personal responsibility and moral guilt.[132] Galindo asserts that under those cases, he had a right to know under which theory of first degree murder he was being tried and had a right to step instructions mandating specific findings pertaining to his level of culpability. In order to address these arguments, we first discuss, in some detail, those two cases and their progeny.
In Enmund, the defendant was sentenced to death after being convicted as an aider and abettor to felony murder. The only evidence of the defendant's participation in the crime was that he waited in a car a few hundred feet away to help the two robbers, who had killed the victims, escape. The Court held that the defendant's death sentence was a violation of his Eighth Amendment rights, because there was no evidence the defendant himself killed, attempted to kill, or intended or contemplated that a life would be taken.
Under the statutory scheme by which the defendant was convicted and sentenced to death, the State only needed to show that the aider and abettor to the felony murder intended the underlying crime. The jury was instructed that it need not conclude there was a premeditated design or intent to kill, and there was no requirement under the statutes charged that the State present any proof as to the defendant's mental state.
This, the Court explained, was distinguishable from the statutory schemes of most other states which generally rejected the death penalty for simple accomplice liability in felony murders โ what the Court later called "felony murder simpliciter."[133] The Court observed that of those states that allowed capital punishment for felony murder accomplices, the death penalty was more narrowly conscribed to situations where sufficient aggravating circumstances are present. And most of those states made it a statutory mitigating circumstance that the defendant was an accomplice in a capital felony committed by another person and that his participation was relatively minor. Specifically commenting on this mitigating circumstance, the Court explained: "By making minimal participation in a capital felony committed by another person a mitigating circumstance, these sentencing statutes reduce the likelihood that a person *232 will be executed for vicarious felony murder."[134]
Based on a review of the statutory schemes and the circumstances under which the death penalty had actually been imposed, the Court concluded that society generally rejected the idea of capital punishment for felony murder simpliciter. And, unless the death penalty applied to a particular situation measurably contributes to the goal of either retribution or deterrence, then it is nothing more than the purposeless and needless imposition of pain and suffering.[135]
The Court concluded that imposing the death penalty on those guilty of felony murder simpliciter did not measurably contribute to the goal of deterrence, because the likelihood of a killing in the course of a robbery was not so substantial that "one should share the blame for the killing if he somehow participated in the felony."[136] This left retribution as the only possible justification for executing the defendant, but, punishment as retribution "must be tailored to [the defendant's] personal responsibility and moral guilt" and to the defendant's "intentions, expectations, and actions."[137] It must be tailored to the defendant's culpability, "not on that of those who committed the robbery and shot the victims."[138] The Court concluded that "[p]utting [the defendant] to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts."[139]
The U.S. Supreme Court in Tison clarified that simply because the circumstances in Enmund did not meet the culpability requirements for imposing the death penalty, it did not follow that the death penalty could not be constitutionally imposed against any accomplice to felony murder who did not "kill, or intended that a killing take place."[140] The defendants in Tison were convicted of felony murder and sentenced to death in connection with their actions in providing weapons and assisting in an armed prison escape of two convicted murderers. They then helped flag down an innocent family to steal their vehicle, watched the family be murdered by the escapees, and continued in the joint criminal venture for several days afterward until their eventual arrest. This, the Court explained, was a far cry from "the minor actor" in Enmund.[141]
The Court explained that even though they did not themselves kill or intend to kill, it was constitutionally permissible to execute the two defendants in Tison because they were both major participants in a dangerous crime. The Court then stated:
[T]he reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that *233 conduct causes its natural, though also not inevitable, lethal result.[142]
And "the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life."[143]
The Court explicitly declined in Tison "to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty"[144] in other cases, but it did hold that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement."[145]

(a) Step Instruction
Galindo's principal argument is that the trial court erred in denying his requested step instruction for the jury. Galindo requested a step instruction to determine whether a verdict of first degree murder was based on the theory of premeditation or felony murder. Galindo then requested that the jury be instructed that if it found him guilty of felony murder, it must determine (1) whether Galindo was "a major participant in the felony" committed and (2) whether he demonstrated "reckless indifference to human life."
Galindo argues that because the jury was given a general verdict form, we cannot know whether it convicted him solely as an aider and abettor to felony murder and rejected a premeditated intent to kill. If it did, then Galindo asserts that his crimes fall under the concerns of Enmund/Tison, because he did not himself kill four of the victims and he purportedly killed Elwood accidentally. And Galindo argues that the Enmund/Tison factors are "`functional equivalent[s]'" of elements of the offense of death-eligible felony murder that, under Ring, must be found by a jury beyond a reasonable doubt.[146]

(i) Separating Premeditated From Felony Murder
We have explained that premeditated murder and felony murder are but different ways to commit a single offense of first degree murder.[147] And where a single offense may be committed in a number of different ways and there is evidence to support each of the ways, the jury need only be unanimous in its conclusion that the defendant violated the law by committing the act.[148] It need not be unanimous in its conclusion as to which of several consistent theories it believes resulted in the violation. Therefore, we have held that the trial court is not required to provide separate verdict forms for these two different theories of first degree murder.[149]
The U.S. Supreme Court has agreed, but has noted that simply because such a general verdict under two alternate theories of first degree murder does not "fall beyond the constitutional bounds of fundamental fairness and rationality," this is *234 "not [to] suggest that jury instructions requiring increased verdict specificity are not desirable."[150] The Arizona Supreme Court in State v. Smith[151] explained further:
[A]s a matter of sound administration of justice and efficiency in processing murder cases in the future, we urge trial courts, when a case is submitted to a jury on alternate theories of premeditated and felony murder, to give alternate forms of verdict so the jury may clearly indicate whether neither, one, or both theories apply.
The court in Smith illustrated that in death penalty cases, this "would be of great benefit to the trial court and to the reviewing courts in determining death penalty questions under the Enmund/Tison analysis."[152] In addition, the court noted that it had in the past been forced to reverse a general first degree murder verdict when it found the evidence failed to support the underlying felony โ because it was simply unknown whether the verdict was based on felony murder or premeditation.
For the following reasons, we conclude that Galindo's Enmund/Tison arguments are without merit.

(ii) Enmund/Tison Findings as Functional Elements of Offense
Galindo's main purpose in separating premeditated from felony murder in the proposed jury instructions was to demand that the jury then make Enmund/Tison findings. It is error when the instructions provided do not require a jury to find each element of the crime under the proper standard of proof.[153] Before Ring, it was clear that there was no entitlement, absent legislation so providing, to Enmund/Tison findings by a jury beyond a reasonable doubt. Galindo argues, again, that Ring has changed the analysis.
In Cabana v. Bullock,[154] decided shortly before Tison, the U.S. Supreme Court explained that its ruling in Enmund "establishes no new elements of the crime of murder that must be found by the jury."[155] The defendant in Cabana had been sentenced to death after being found guilty of first degree murder under a general verdict. It was thus unclear whether the defendant was found guilty under a theory of premeditated or felony murder. The evidence was also unclear as to whether the defendant had actually killed. The Fifth Circuit Court of Appeals reversed the conviction because it concluded that Enmund prohibited the defendant's execution absent Enmund findings by the trier of fact beyond a reasonable doubt, but the Court reversed, holding that the circuit court had misunderstood Enmund.
The Court clarified that Enmund "`does not affect the state's definition of any substantive offense, even a capital offense.'"[156] *235 Instead, it is simply a "substantive limitation on sentencing, and like other such limits it need not be enforced by the jury."[157] The Court explained:
[T]he decision whether a sentence is so disproportionate as to violate the Eighth Amendment in any particular case, like other questions bearing on whether a criminal defendant's constitutional rights have been violated, has long been viewed as one that a trial judge or an appellate court is fully competent to make.[158]
Accordingly, "[a]t what precise point in its criminal process a State chooses to make the Enmund determination is of little concern from the standpoint of the Constitution."[159]
In State v. Bjorklund,[160] we likewise rejected the defendant's argument that the death penalty could not be imposed without a jury's finding that the defendant intended to kill, attempted to kill, or actually did kill the victim; had a major personal involvement in any underlying felony during which the victim was killed; or showed a reckless indifference to human life. In affirming the imposition of the death penalty, we explained:
[I]t is not the province of the jury to make the findings posited by [the defendant] in this assignment of error. The lack of a jury finding in this regard has no impact on sentencing because the Enmund v. Florida, supra, question is addressed as a mitigating circumstance during the sentencing phase of a capital case. It is, by statute, a mitigating circumstance that "[t]he offender was an accomplice in the crime committed by another person and his participation was relatively minor." ง 29-2523(2)(e). The trial court found during sentencing that [the defendant] failed to establish this mitigator by a preponderance of the evidence....[161]
We also observed that based on the evidence at trial, the concerns of the Court in Enmund were not present.[162]
Galindo argues that, under Ring, Enmund/Tison findings are akin to statutory aggravating circumstances and are likewise functional equivalents of elements of the offense. Galindo argues that this is so because without those findings, an accomplice to felony murder cannot be subjected to the increased penalty of death. This is the first time that the relationship between Enmund/Tison and Ring has been squarely presented to this court. We determine, however, that the relevant holdings of Bjorklund and Cabana remain good law. Enmund/Tison "findings" are not elements of the offense of felony murder, even when the death penalty is imposed.
Under Ring, the U.S. Supreme Court held there was a right to jury factfinding of aggravating circumstances, because if state law makes a factual finding a necessary prerequisite to imposing a greater punishment than authorized without such a finding, then a defendant has a Sixth Amendment right to have this finding made by a jury beyond a reasonable *236 doubt.[163] In short, Ring extended Sixth Amendment jury protections to aggravating sentencing considerations.[164] The Court explained that "[c]apital defendants... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."[165]
The Court has since explained that the "animating principle [of the rule in Ring] is the preservation of the jury's historic role as a bulwark between the State and the accused at the trial."[166] "[T]he Sixth Amendment does not countenance legislative encroachment on the jury's traditional domain."[167] That domain includes "the existence of `"any particular fact"' that the law makes essential to his punishment."[168]
But, as the Court explained in Cabana, Eighth Amendment considerations such as those in Enmund and Tison are traditionally the domain of a trial judge or appellate court, and not a jury. On remand in Ring, the Arizona Supreme Court specifically addressed the relationship between Ring and Enmund/Tison. Although the defendant had also complained to the U.S. Supreme Court that he was entitled to a jury determination of the Enmund/Tison factors, that issue was never addressed by its decision.[169]
The Arizona Supreme Court determined that Ring did not require a jury determination of "Enmund-Tison findings."[170] Such findings were part of an Eighth Amendment proportionality analysis and were nothing more than a judicially crafted instrument used to measure proportionality between a defendant's criminal culpability and the sentence imposed. They do not concern whether the State has met its burden to prove the offense, but instead whether, given a defendant's culpable mental state, the government can impose capital punishment consistent with the Eighth Amendment's proportionality threshold. This is "conceptually and constitutionally distinct"[171] from the Sixth Amendment analysis in Ring. As stated by another court in rejecting any relationship between Ring and Enmund/Tison, the Enmund/Tison determination "is a limiting factor, not an enhancing factor."[172]
We agree. Enmund and Tison did nothing more than provide guidance to the courts in their traditional Eighth Amendment analysis of certain circumstances. In fact, as a careful reading of Enmund and Tison makes clear, any attempt to bottle Enmund and Tison into a formula of "factors" or "findings" is inappropriate and contradicts the U.S. Supreme *237 Court's statement that it was not providing a precise delineation of "particular types of conduct and states of mind warranting imposition of the death penalty" in other cases.[173] As explained in Schriro,[174]Ring did not touch on what elements are essential for a constitutional statutory scheme. And the Nebraska Legislature has not chosen to make any sort of Enmund/Tison finding a prerequisite to imposing a greater punishment than that which would be authorized, under law, without such a finding. In other words, Enmund/Tison considerations are not facts on which "the legislature conditions an increase in their maximum punishment."[175] They are, accordingly, not within the jury's traditional domain. As previously discussed, Ring was a limited, procedural holding concerning the Sixth Amendment. It does not cast any doubt on the traditional view that Enmund and Tison present no new elements of the offense of death-eligible felony murder.

(b) Bill of Particulars
Galindo also argues that the trial court erred in overruling his bill of particulars by which he sought to know exactly what theory of first degree murder the State intended to prove against him. Galindo asserts he had a due process right to know whether the State would attempt to prove that he was a major participant in the crime who displayed a reckless indifference to human life. Under Ring and related cases,[176] Galindo claims that the indictment must inform the defendant of any issue that would increase the punishment for the offense charged.
In line with our holdings concerning general verdict forms for first degree murder, we have said that it is not error to charge a defendant in the information with first degree murder without specifying whether the State's theory is felony murder or premeditated murder.[177] Rather, the charge is for a single crime and arises out of one set of facts.[178] And, we have already concluded that the holding in Ring is inapplicable to Enmund/Tison considerations. We accordingly find no error in the trial court's refusal to grant Galindo's bill of particulars.

(c) Whether Eighth Amendment Prohibits Any of Galindo's Death Penalty Sentences
To the extent that Galindo challenges the constitutionality of his ultimate penalty under Enmund/Tison, we conclude that none of the convictions violate Galindo's Eighth Amendment right against excessive punishment. While findings of culpability under Enmund/Tison need not necessarily be made by the jury,[179] for all five victims, the jury found aggravating circumstance (1)(f). Section 29-2523(1)(f) states that at the time of the murder, the defendant knowingly created a great risk of death to at least several persons.
The instruction on accomplice liability relevant to this aggravating circumstance read as follows:
[Galindo] can be guilty of an aggravator even though he personally did not commit the act involved in the crime so *238 long as he aided someone else to commit it. [Galindo] aided someone else if:
(1) [Galindo] intentionally encouraged or intentionally helped another person to commit the aggravator; and
(2) [Galindo] intended that an aggravator be committed; or [he] knew that the other person intended to commit or expected the other person to commit the aggravator; and
(3) the aggravator in fact was committed by that other person.
Thus, under this instruction, a finding of aggravating circumstance (1)(f) was a finding that Galindo intentionally or knowingly encouraged an act in which he knew or expected would create a great risk of death to several persons. Put another way, the jury found that Galindo acted with a reckless disregard for human life.
In addition, the sentencing panel specifically rejected the presence of mitigating circumstance (2)(e). Section 29-2523(2)(e) states that the offender was an accomplice in the crime committed by another person and that his or her participation was relatively minor. The sentencing panel stated it found "no evidence to support the existence of this mitigating circumstance and concludes that it does not apply." As the U.S. Supreme Court in Enmund said: "By making minimal participation in a capital felony committed by another person a mitigating circumstance, these sentencing statutes reduce the likelihood that a person will be executed for vicarious felony murder."[180]
In fact, Galindo does not deny that he was a major participant in the underlying felony. Galindo was one of the principal planners of the robbery and one of the principal actors. As the U.S. Supreme Court indicated in Tison, the relationship between major participation and reckless disregard for human life is almost inseparable. This is especially true when the crime involves the armed robbery of a bank. Assuming without deciding that Enmund/Tison considerations are relevant when a defendant has actually killed one of the victims, the State has made more than an adequate showing here that those considerations are satisfied. Galindo was a major participant in the robbery, and he acted with a reckless disregard for human life; the Eighth Amendment does not prohibit him from being sentenced to the death penalty.

6. EVIDENTIARY CHALLENGES CONSIDERED DURING AGGRAVATION AND SENTENCING PHASES
We turn next to miscellaneous challenges Galindo makes to the trial court's evidentiary rulings during the aggravation and sentencing stages of trial. First, Galindo argues that he was prejudiced by the jury's exposure during the aggravation hearing to a photograph of Lundell's body. Second, Galindo argues that the three-judge panel should not have been allowed to consider the presentence investigation report, the aggravation hearing record, and certain victim impact statements. Finally, Galindo argues that he was prejudiced when the sentencing panel, for purposes of proportionality review, refused to consider his offers of other first degree murder cases for which the death penalty was not imposed and the "Baldus Report."

(a) Photograph of Lundell's Body During Aggravation Hearing
Galindo chose jury determination of aggravating circumstances.[181] One of the aggravating circumstances alleged and found was that based upon Galindo's participation *239 in Lundell's murder, he had a substantial prior history of serious assaultive or terrorizing criminal activity.[182] The evidence was relevant to the jury's finding that the State had proved aggravator (1)(a).
Over Galindo's objection, the court allowed the jury to view a photograph of Lundell's decomposed body. The pathologist testified that he was unable to determine the exact cause of Lundell's death. The photograph does show, however, that Lundell had been gagged and that his legs and feet were bound. The photograph also shows that Lundell's body had been burned before being taped up in a blanket and buried.
Galindo had offered to stipulate to the location of Lundell's body, but the State refused to enter into the stipulation. Galindo argues that because of his offer to stipulate and the fact that the exact cause of death was not able to be determined from the photograph, the photograph had little probative value. In contrast, Galindo claims the photograph was particularly prejudicial. Galindo asserts that the photograph was thus inadmissible under Neb. Evid. R. 403, Neb.Rev.Stat. ง 27-403 (Reissue 2008). Galindo did not stipulate to his involvement in Lundell's murder, and he does not contend that the State did not have to prove his involvement to show he had a substantial prior history of serious assaultive or terrorizing criminal activity.
Under the previous law, when a sentencing judge or panel of judges decided both aggravating and mitigating circumstances, this court held that the sentencing panel could consider unadjudicated misconduct in the penalty phase of a capital trial.[183] The issue in State v. Reeves[184] was whether the sentencing panel could consider unadjudicated misconduct to rebut the existence of a mitigating circumstance, i.e., that the defendant had no significant history of prior criminal activity. But we relied extensively on cases in which other state and federal courts had permitted evidence of unadjudicated offenses to prove an aggravating factor in the sentencing phase of a capital trial. Those courts reasoned that the evidence is not unfairly prejudicial, because guilt has already been determined in the sentencing phase. They further reasoned that evidence of a defendant's previous violent criminal conduct is particularly relevant to individualized capital sentencing. After reviewing these cases, we agreed with those courts:
"[A]s is true in all other criminal causes, the sentencing authority in a death penalty case should be presented with a full range of relevant information so as to fashion a particular penalty in accord with `the prevalent modern penal philosophy of individualized punishment.'"... In Nebraska, the sentencing court in noncapital cases is allowed wide latitude in the information it considers, including consideration of unadjudicated misconduct.... This wide latitude should not be circumscribed in capital cases, where the need for individualized punishment is crucial because of the seriousness of the offense and gravity of possible penalties which may be imposed after conviction.
....
"In the proceeding for determination of sentence, evidence may be presented *240 as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances set forth in section 29-2523. Any such evidence which the court deems to have probative value may be received."
....
Moreover, because in Nebraska capital sentencing is conducted by a single judge or a panel of three judges and not by a jury, the risk that the sentencer might be unduly prejudiced by the admission of such evidence is minimized.[185]
As this statement illustrates, our holding and reasoning in Reeves also apply to aggravating circumstances, with the added requirement that the State must prove the unadjudicated offense beyond a reasonable doubt under Nebraska Evidence Rules.[186] Because unfair prejudice in the determination of Galindo's guilt for the charged murders was not an issue and the evidence is relevant for sentencing, the admission of the photograph was controlled by rule 403.
In a homicide prosecution, photographs of a victim may be received into evidence for the purpose of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.[187] Even had the State accepted the stipulation, the photograph remained probative of the condition of the body, malice, and intent. But we point out that, generally, a defendant cannot negate an exhibit's probative value through a tactical decision to stipulate.[188] The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.[189]
The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.[190] The trial court did not abuse its discretion in admitting the photograph of Lundell's body.

(b) Presentence Investigation Considered by Three-Judge Panel
Galindo also claims error stemming from the admission of the presentence investigation report before the three-judge panel. Galindo's argument against the admissibility of the presentence investigation is mostly entangled with arguments against the validity of L.B. 1 already considered above. However, Galindo also asserts that the presentence investigation report was inadmissible hearsay; violated his rights to confrontation; and was not admissible under L.B. 1, at least for certain purposes โ on which Galindo is unclear.
Section 29-2521(3) states:
When a jury renders a verdict finding the existence of one or more aggravating circumstances as provided in section 29-2520, *241 the panel of judges shall, as soon as practicable after receipt of the written report resulting from the presentence investigation ordered as provided in section 29-2261, hold a hearing to receive evidence of mitigation and sentence excessiveness or disproportionality.
(Emphasis supplied.) Neb.Rev.Stat. ง 29-2261(1) (Cum. Supp. 2006), in turn, stated that in the case of first degree murder where either the jury finds the existence of one or more aggravating circumstances or the offender waives the right to a jury determination of aggravators and the information contains a notice of aggravation, "the court shall not commence the sentencing determination proceeding as provided in section 29-2521 without first ordering a presentence investigation of the offender and according due consideration to a written report of such investigation." (Emphasis supplied.)
Galindo's arguments that L.B. 1 does not conceive of the admission of presentence investigations, and thus that his due process rights under the scheme were violated, stem from his assertion that the terms "court" and "panel" as used in these sections are not interchangeable. He also spends much time arguing what "due consideration"[191] might entail. According to Galindo, it is possible that under L.B. 1, the presentence investigation is meant to be utilized by the trial judge, i.e., "the court," only for the purpose of determining the appropriate sentence for crimes other than first degree murder or for purposes of sending the report on to the Department of Correctional Services. In contrast, when there is a "panel," i.e., when the death penalty is at stake, Galindo asserts that the statutory language indicates that, at most, the panel may consider the presentence investigation for the purpose of finding mitigating circumstances. Galindo argues that the panel may not utilize the report to weigh the aggravating against mitigating circumstances or in its ultimate sentencing determinationโin large part because of Galindo's previous argument that the panel cannot consider evidence of aggravating circumstances at all.
It is unclear what prohibited usage of the report Galindo is alleging actually occurred. We surmise, however, that he finds prejudice from the court's knowledge of anything negative in the report, including his attempted escape from prison or other postincarceration behaviors that the sentencing panel specifically referred to in its consideration of whether there existed the nonstatutory mitigating circumstance that he cooperated with authorities. Under Galindo's interpretation of L.B. 1, the report can be used only for his benefit and can in no way prejudice him.
Galindo attributes too much to the statutes' alternate usage of "panel" and "court." We find nothing in the statutes to support Galindo's narrow interpretation of the permitted use of the report. Section 29-2521(3) plainly states that the panel of judges shall receive the presentence investigation report before holding a hearing to receive evidence of mitigation and sentence excessiveness or disproportionality. It logically follows that the report is to be considered for these purposes. As will be discussed below, in response to Galindo's allegation that the panel imposed a nonstatutory aggravator, the panel did not use the presentence investigation report for any prohibited purpose under this reading of the statute.
With regard to the hearsay and confrontation arguments, we equally *242 find no merit. The sentencing phase is separate and apart from the trial phase. We recognize that under Nebraska's sentencing scheme, the Nebraska Evidence Rules apply to evidence relating to aggravating circumstances.[192] But the Legislature did not provide that the Nebraska Evidence Rules shall apply to all evidence relevant to sentencing. We have held that the traditional rules of evidence may be relaxed following conviction so that the sentencing authority can receive all information pertinent to the imposition of sentence.[193] We conclude that this rule is still applicable to the sentencing phase of a capital trial except for evidence related to the finding of statutory aggravating circumstances. Presentence investigation reports have a particularly established role in the sentencing process. We have recognized that these reports are essential to a court's enlightened and just sentencing.[194] And a court does not violate a defendant's due process rights by considering information in a presentence report when the defendant had notice and an opportunity to obtain access to the information in the report and to deny or explain the information to the sentencing authority.[195] Further, we have held that the Confrontation Clause does not attach to the use of presentence reports in capital sentencing proceedings.[196] We find no error stemming from the panel's consideration of the presentence investigation report.

(c) Record From Aggravation Hearing
We have already considered this argument in part V.2(b) above.

(d) Victim Statements Before Sentencing Panel
Galindo makes three basic arguments regarding the trial court's admission, over his objection, of the victim impact statements. Galindo first argues that because ง 29-2521(3) does not specifically list victim impact statements as something to be considered by the panel, then any such statements are barred by statute. Second, relying on what he claims to be the "watershed rule"[197] announced in Crawford v. Washington,[198] Galindo argues that the victim impact statements violate the Sixth Amendment's confrontation clause. Finally, Galindo asserts that if victim impact statements are admissible, he has a right to have any victim impact statements limited to those contained in the presentence investigation report and limited to "nearest surviving relative" as defined by ง 29-119.

(i) Nebraska Crime Victim's Reparations Act
Victim impact statements are provided for in the Nebraska Crime Victim's Reparations Act (NCVRA).[199] The *243 NCVRA was enacted to enable the rights set forth in article I, ง 28, of the Nebraska Constitution.[200] Article I, ง 28, of the Nebraska Constitution specifies that the rights of a "victim of a crime, as shall be defined by law, or his or her guardian or representative," include the right to "make an oral or written statement at sentencing, parole, pardon, commutation, and conditional release proceedings." Article I, ง 28, further states that its "enumeration of certain rights for crime victims shall not be construed to impair or deny others provided by law or retained by crime victims" and that "[n]othing in this section shall constitute a basis for error in favor of a defendant in any criminal proceeding. . . ."
Section 81-1848 of the NCVRA states that victims, as defined in ง 29-119, have certain enumerated rights, including the "right to make a written or oral impact statement to be used in the probation officer's preparation of a presentence investigation report concerning the defendant"[201] and the right "to submit a written impact statement at the sentencing proceeding or to read his or her impact statement submitted pursuant to subdivision (1)(d)(iv)."[202]
"Victim" is defined in ง 29-119 in relevant part as "[i]n the case of a homicide,. . . the nearest surviving relative under the law as provided by ง 30-2303 but does not include the alleged perpetrator of the homicide." Neb.Rev.Stat. ง 30-2303 (Reissue 2008) describes the order of intestate succession.

(ii) L.B. 1
Galindo is fundamentally mistaken in his apparent belief that principles of strict construction of criminal statutes mandate that those things not specifically listed are thereby prohibited. This is especially true where other statutes explicitly provide for the admissibility of those things upon which the first statute is silent. In interpreting statutes, all existing acts should be considered.[203] And, in the absence of clear legislative intent, the construction of a statute will not be adopted which has the effect of nullifying another statute.[204] We find no merit to Galindo's contention that L.B. 1 prohibits the panel's consideration of victim impact statements.

(iii) Confrontation
The U.S. Supreme Court has held that victim impact statements considered at sentencing to show the personal characteristics of the victim or the emotional impact of the crime on the family do not violate the U.S. Constitution.[205] Furthermore, as already mentioned, we have long held that the Sixth Amendment right to be "`confronted with the witnesses against'" one is not applicable to the sentencing phase of a criminal trial.[206] But Galindo claims this precedent is no longer good law *244 after the U.S. Supreme Court's decision in Crawford. Galindo asserts that victim impact statements fall under the definition in Crawford of "`testimonial' statements"[207] and that therefore, he has a right to cross-examine the statements. Although a Crawford analysis is equally applicable to some of Galindo's other confrontation-based arguments against the admissibility of evidence before the panel, it is only in the context of the victim impact statements that his argument is fully articulated. And so, it is here that we discuss it.
Paraphrasing the definition in Crawford of a testimonial statement, Galindo asserts that "[v]ictim impact statements are solemn declarations or affirmations made for the purpose of establishing or proving some fact, namely, the impact a victim's death has had on family members."[208] Of course, Galindo does not go so far as to actually contest the sincerity of the victims' sentiments expressed in the impact statements. He does not so much lament the inability to cross-examine the victims as the fact that the victims' statements were considered at all. In fact, the record is unclear as to whether Galindo's Crawford objection was to all the victims' statements or was instead limited to the State's proposed introduction of a videotape containing victim statements, an action which the trial court disallowed. We conclude that Crawford has no effect on the longstanding proposition that the right to confrontation is inapplicable to sentencing proceedings.
The Sixth Amendment's Confrontation Clause provides that "`[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'"[209]Crawford considered the meaning of the phrase "witnesses against him" and to what extent an out-of-court statement was a "witness against" the defendant. The Court held that any testimonial statement was subject to the defendant's right to confrontation. The pivotal holding was that "testimonial statements"[210] could not be admitted against a defendant at trial without an opportunity to cross-examineโregardless of rules of evidence that would allow the statements under "amorphous notions of `reliability.'"[211]
The Court in Crawford did not address in what stage of the trial proceedings confrontation rights apply. It only considered to what type of evidence that right applies. As such, Crawford did not abrogate precedent that the right is inapplicable to sentencing proceedings. Indeed, as the Court in Crawford discussed, the concern of the Confrontation Clause is the right to confront one's "accusers."[212] A defendant cannot be found guilty based on accusations of witnesses whom the defendant has not been able to cross-examine.[213] In our bifurcated system of guilt and sentencing, however, there are no longer "accusers" at the sentencing stage. At the sentencing stage, the accusations have been resolved by the trier of fact against the defendant. The defendant is no longer the accused, but the convicted.
The U.S. Supreme Court has explained that "[w]hatever the prevailing sentencing *245 philosophy, the sentencing authority has always been free to consider a wide range of relevant material."[214]
[S]ince the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.[215]
Essential to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.[216] For this reason, we agree with most courts that have addressed the applicability of Crawford to the confrontation analysis in sentencing proceedings, and we hold that it in no way requires alteration of the proposition that Sixth Amendment rights are inapplicable during sentencing.[217]

(iv) Neither Nearest Surviving Relative Under ง 30-2303 nor Contained in Presentence Investigation Report
Finally, we find no merit to Galindo's argument that the trial court committed reversible error in allowing relatives to testify that may not be considered the nearest surviving relatives under ง 30-2303. The definition of "victim" upon which Galindo relies merely provides for a baseline right, under the NCVRA, to give a victim impact statement. The NCVRA does not seek to limit the sentencing court's traditional discretion to consider evidence from a variety of sources. For similar reasons, we find no merit to Galindo's strict interpretation of the NCVRA to conclude that no victim impact statement is admissible before the sentencer unless it was first contained in the presentence investigation. In summary, we find no error stemming from the three-judge panel's consideration of the victim impact statements made before it.

(e) Failure to Consider First Degree Murder Cases in Which Defendant Was Not Sentenced to Death and "Baldus Report"
Galindo's counsel asked the sentencing panel to receive into evidence all of the first degree murder sentencing orders in Nebraska and also a certain report on homicide cases in Nebraska,[218] what he refers to as the "Baldus Report," although it is not commonly known under that title.[219] The report gives a narrative of the facts involved in all death-eligible cases prosecuted from 1973 to 1999. It was written for the Nebraska Commission on Law Enforcement and Criminal Justice *246 during the time that L.B. 1 was under consideration. The report analyzes the impact of aggravating and mitigating circumstances on prosecutorial and judicial decisionmaking and identifies any geographic or racial facts in sentencing. The sentencing panel, citing State v. Lotter[220] and State v. Palmer,[221] concluded that it would review only those cases in which the death penalty had been imposed. The panel thus reviewed 15 cases, commencing in 1973, in which the death penalty was imposed. It found that the sentences of death in Galindo's case was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the reasons explained below, we find no error.

(i) Non-Death-Penalty First Degree Murder Convictions
Galindo argues that ง 29-2521(3) does not limit the sentencing panel's review to only those cases where the death penalty is imposed, but instead plainly mandates that the panel consider all similar cases. Galindo concedes that the Eighth Amendment does not require a court to engage in a proportionality review. He claims instead that his due process right to the procedures afforded by the statute was violated.[222] Galindo also claims his right to a fair hearing on proportionality was denied, because merely considering cases where the death penalty was imposed does not reveal whether those who are sentenced to death are being discriminated against.
Section 29-2521(3) states that the sentencing panel shall hold a hearing to receive evidence of mitigation and sentence excessiveness or disproportionality. It states that "[e]vidence may be presented as to any matter that the presiding judge deems relevant to . . . (b) sentence excessiveness or disproportionality as provided in subdivision (3) of section 29-2522."[223] Section 29-2522(3), in turn, states that the sentencing determination shall be based, in addition to the aggravating and mitigating circumstances, on "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
In Bjorklund, we held that proportionality review by the sentencing body entails consideration only of other cases in which the death penalty has been imposed. Specifically, we held that the term "`similar cases,'" as used in ง 29-2522, refers to cases where the defendant was sentenced to death.[224] We have since affirmed this holding in Lotter.[225] The case law upon which Galindo relies was prior to our holding in Bjorklund, and Galindo gives us no compelling reason to reconsider that holding. The U.S. Supreme Court has explained that proportionality review is not a constitutionally required means of ensuring, under the 8th and 14th Amendments, that the death sentence not be "so wantonly and so freakishly imposed."[226] And *247 we find no merit to Galindo's argument that he was denied a fair hearing on proportionality by considering only death penalty cases.

(ii) "Baldus Report"
The evidence referred to as the "Baldus Report" concludes that compared to other jurisdictions, the Nebraska capital system appears to be reasonably consistent and successful in limiting death sentences to the most culpable offenders.[227] The report concluded that there is no significant evidence of the disparate treatment of defendants based on the race of the defendant or the race of the victim.[228] The report has little if any relevance to Galindo's sentencing proceedings. As such, we conclude that the sentencing panel did not abuse its discretion in refusing to admit this report.

(f) Nonstatutory Mitigators
We next consider Galindo's assertion that the sentencing panel improperly found and imposed against him a nonstatutory aggravating circumstance. In its sentencing order, the panel first lists the five aggravating circumstances found by the jury. The panel then concludes that no statutory mitigating circumstances existed. After that, the panel considered whether any nonstatutory mitigating circumstances were present. In particular, it considered the nonstatutory mitigating circumstance proffered by Galindo that he had cooperated with law enforcement personnel following his arrest. The sentencing order states:
The panel determines that this mitigating circumstance does exist. This mitigating circumstance is offset, in part, by the fact that [Galindo] does not demonstrate remorse for his actions. His cooperation has been tempered by his actions and behavior during his post-arrest incarceration. The panel gives this mitigating factor little weight in determining the sentences to be imposed.
Galindo's postarrest actions and behavior referred to by the panel included an attempted escape from prison and a general lack of remorse for his crimes.
The next section of the panel's order sets forth its task in making the ultimate determination of whether to impose the death penalty. The panel explained that "[w]eighed against the [five] aggravating circumstances are no statutory mitigating circumstances and one non-statutory mitigating circumstance, to which the panel gives little weight." The panel stated that it had some concern with historic questions surrounding aggravating circumstance (1)(c), but even disregarding that aggravating circumstance, "the remaining factors are not approached or exceeded in weight by the one mitigating circumstance."
According to Galindo, the panel's reference to his postarrest behavior was effectively the imposition of additional "nonstatutory aggravators"[229] against him. Its consideration, argues Galindo, violated not only L.B. 1, but the Eighth Amendment principle under Furman v. Georgia[230] that a legislature specifically define aggravating circumstances that make a person eligible for the death penalty.
We conclude that the panel, in its sentencing calculus, did not consider any nonstatutory aggravating circumstance. Instead, the court's order, read in its entirety, simply determines the extent to which Galindo had cooperated with law *248 enforcement. The panel was not obligated to consider the nonstatutory mitigating circumstance of postarrest cooperation in a vacuum of a single act without reference to Galindo's motivation.

7. ELECTROCUTION AS CRUEL AND UNUSUAL PUNISHMENT
Galindo's challenge to the electric chair as a method of implementing the death penalty was made prior to our opinion in Mata II.[231] In accordance with our opinion therein, we do find merit to this assignment of error. But, in accordance with that opinion, we nevertheless affirm the sentence of death.

8. DE NOVO REVIEW
When a death sentence is appealed, this court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty; we must also determine whether the sentence is excessive or disproportionate to the penalty imposed in similar cases.[232] We have reviewed our relevant decisions on direct appeal from other cases in which aggravating circumstances were found and the death penalty was imposed by the district court.[233] In particular, we take note of State v. Moore,[234] wherein we affirmed the sentence of death for the defendant's convictions of two counts of first degree murder of two cabdrivers during the perpetration of a robbery.
We agree with the sentencing panel that the five aggravating circumstances found in this case far outweigh the nonstatutory mitigating circumstance of Galindo's cooperation with authorities. Galindo knowingly participated in a dangerous crime in which five innocent victims were almost immediately shot and killed without any provocation. He planned for this crime by assisting in the murder of Lundell so that his recruit, Vela, could prove himself worthy of the robbery. In our de novo review, we conclude that the sentence of death is proportionate to the nature of the crimes and to the penalty imposed in similar cases.

VI. CONCLUSION
For the foregoing reasons, we find no merit to Galindo's assignments of error, except that assignment challenging electrocution as the method of death. We affirm the death sentence against Galindo for the murder of five people in an attempted bank robbery.
AFFIRMED.
HEAVICAN, C.J., not participating.
NOTES
[1] 2002 Neb. Laws, L.B. 1.
[2] See Neb.Rev.Stat. งง 25-1628 and 25-1629 (Cum. Supp. 2004).
[3] See Neb.Rev.Stat. ง 29-2005 (Reissue 2008).
[4] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[5] Brief for appellant at 94.
[6] State v. Epting, 276 Neb. 37, 751 N.W.2d 166 (2008); State v. Jim, 275 Neb. 481, 747 N.W.2d 410 (2008); State v. Bossow, 274 Neb. 836, 744 N.W.2d 43 (2008); State v. McKinney, 273 Neb. 346, 730 N.W.2d 74 (2007).
[7] State v. Hessler, 274 Neb. 478, 741 N.W.2d 406 (2007).
[8] Id.
[9] Neb.Rev.Stat. ง 29-2519 (Reissue 2008).
[10] Id.
[11] See Neb.Rev.Stat. ง 29-2522 (Reissue 2008).
[12] ง 29-2522.
[13] Ring v. Arizona, supra note 4.
[14] Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).
[15] Beazell v. Ohio, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925).
[16] See id.
[17] See id.
[18] Hopt v. Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884).
[19] Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).
[20] Id.
[21] Ring v. Arizona, supra note 4.
[22] Id., 536 U.S. at 609, 122 S.Ct. 2428.
[23] Neb.Rev.Stat. ง 29-2520 (Reissue 2008).
[24] Neb.Rev.Stat. ง 29-2521 (Reissue 2008).
[25] State v. Gales, 265 Neb. 598, 658 N.W.2d 604 (2003).
[26] Id.
[27] Schriro v. Summerlin, supra note 19.
[28] Id., 542 U.S. at 354, 124 S.Ct. 2519 (emphasis in original).
[29] Id. (emphasis supplied).
[30] Id. (emphasis in original).
[31] Id.
[32] State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003), abrogated on other grounds, State v. Rogers, 277 Neb. 37, 760 N.W.2d 35 (2009).
[33] State v. Mata, 275 Neb. 1, 745 N.W.2d 229 (2008).
[34] Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).
[35] Id., 432 U.S. at 297, 97 S.Ct. 2290.
[36] Id., 432 U.S. at 293-94, 97 S.Ct. 2290.
[37] Brief for appellant at 28.
[38] State v. Lovelace, 140 Idaho 53, 90 P.3d 278 (2003).
[39] Mata II, supra note 33.
[40] Coleman v. McCormick, 874 F.2d 1280 (9th Cir.1989).
[41] Id. at 1288.
[42] Id. at 1289.
[43] Brief for appellant at 36.
[44] Communist Party of U.S. v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).
[45] State v. Palmer, 257 Neb. 702, 600 N.W.2d 756 (1999).
[46] Id.
[47] Id. See, also, Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).
[48] United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).
[49] Id.
[50] Id. See, also, Selective Service v. Minn. Public Int. Res. Gp., 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984); State v. Palmer, supra note 45.
[51] State v. Hessler, supra note 7.
[52] United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).
[53] State v. Hessler, supra note 7.
[54] Id. at 503, 741 N.W.2d at 425.
[55] Id.
[56] Id.
[57] Schad v. Arizona, 501 U.S. 624, 631-32, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).
[58] Brief for appellant at 42.
[59] ง 29-2521(3).
[60] Brief for appellant at 40.
[61] See, State v. Hynek, 263 Neb. 310, 640 N.W.2d 1 (2002); State v. Hookstra, 263 Neb. 116, 638 N.W.2d 829 (2002).
[62] State v. Hessler, supra note 7, 274 Neb. at 513, 741 N.W.2d at 431-32.
[63] Id. at 513, 741 N.W.2d at 432.
[64] State v. Schreiner, 276 Neb. 393, 754 N.W.2d 742 (2008).
[65] State v. Cook, 236 Neb. 636, 463 N.W.2d 573 (1990). See, also, State v. Barker, 227 Neb. 842, 420 N.W.2d 695 (1988).
[66] State v. Miller, 221 Neb. 862, 381 N.W.2d 156 (1986).
[67] Mata I, supra note 32.
[68] State v. Gales, supra note 25.
[69] Id. at 635, 658 N.W.2d at 631 (citation omitted).
[70] See State v. Rodriguez, 244 Neb. 707, 509 N.W.2d 1 (1993).
[71] See, State v. Duncan, 265 Neb. 406, 412, 657 N.W.2d 620, 627 (2003). Accord State v. Chapman, 234 Neb. 369, 451 N.W.2d 263 (1990).
[72] State v. Bjorklund, 258 Neb. 432, 442, 604 N.W.2d 169, 189 (2000), abrogated on other grounds, Mata II, supra note 33.
[73] Id. at 503, 604 N.W.2d at 225.
[74] State v. Duncan, supra note 71; State v. Privat, 251 Neb. 233, 556 N.W.2d 29 (1996).
[75] State v. Hessler, supra note 7; State v. Quintana, 261 Neb. 38, 621 N.W.2d 121 (2001). See, also, Rivera v. Illinois, ___ U.S. ___, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009); United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000); Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); Olmstead v. Noll, 82 Neb. 147, 117 N.W. 102 (1908).
[76] Brief for appellant at 68.
[77] Id. at 71.
[78] ง 29-2006(2). See, also, Neb.Rev.Stat. ง 25-1636 (Reissue 2008).
[79] See, Taylor v. State, 808 So.2d 1148 (Ala. Crim.App.2000); Com. v. Colson, 507 Pa. 440, 490 A.2d 811 (1985), abrogated on other grounds, Com. v. Burke, 566 Pa. 402, 781 A.2d 1136 (2001). See, also, State v. Krutilek, 254 Neb. 11, 573 N.W.2d 771 (1998); Carrillo v. People, 974 P.2d 478 (Colo. 1999); Stokes v. State, 281 Ga. 825, 642 S.E.2d 82 (2007); Powers v. State, 945 So.2d 386 (Miss.2006); State v. Jaynes, 353 N.C. 534, 549 S.E.2d 179 (2001); State v. Gell, 351 N.C. 192, 524 S.E.2d 332 (2000); State v. Sheppard, 84 Ohio St.3d 230, 703 N.E.2d 286 (1998); Com. v. Robinson, 581 Pa. 154, 864 A.2d 460 (2004).
[80] King v. State, 273 Ga. 258, 539 S.E.2d 783 (2000).
[81] Ratliff v. Com., 194 S.W.3d 258 (Ky.2006). See, also, e.g., Vaughn v. Griffith, 565 So.2d 75 (Ala. 1990).
[82] See State v. Rodriguez, 272 Neb. 930, 726 N.W.2d 157 (2007).
[83] See State v. Hessler, supra note 7.
[84] See May v. State, 155 Neb. 786, 54 N.W.2d 62 (1952).
[85] See, Uttecht v. Brown, 551 U.S. 1, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007); State v. Hessler, supra note 7.
[86] Reynolds v. United States, 98 U.S. (8 Otto) 145, 156-57, 25 L.Ed. 244 (1878).
[87] Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).
[88] State v. Hessler, supra note 7.
[89] State v. Rodriguez, supra note 82.
[90] Id.
[91] Id. at 941, 726 N.W.2d at 169.
[92] Irvin v. Dowd, supra note 87.
[93] State v. Williams, 239 Neb. 985, 991, 480 N.W.2d 390, 395 (1992), quoting Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). See, also, 6 Wayne R. LaFave et al., Criminal Procedure ง 23.2(f) (3d ed. 2007).
[94] Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).
[95] State v. Williams, supra note 93, 239 Neb. at 991, 480 N.W.2d at 395, quoting Murphy v. Florida, supra note 94.
[96] Patton v. Yount, supra note 93, 467 U.S. at 1033, 104 S.Ct. 2885, quoting Murphy v. Florida, supra note 94, and Irvin v. Dowd, supra note 87.
[97] Murphy v. Florida, supra note 94, 421 U.S. at 798, 95 S.Ct. 2031. See, also, Dobbert v. Florida, supra note 34.
[98] See, Patton v. Yount, supra note 93; Dobbert v. Florida, supra note 34; State v. Rodriguez, supra note 82.
[99] See Murphy v. Florida, supra note 94, 421 U.S. at 801 n. 4, 95 S.Ct. 2031. See, also, State v. Rodriguez, supra note 82; State v. Boppre, 234 Neb. 922, 453 N.W.2d 406 (1990).
[100] Irvin v. Dowd, supra note 87, 366 U.S. at 726, 81 S.Ct. 1639.
[101] Id. See, also, Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).
[102] Irvin v. Dowd, supra note 87, 366 U.S. at 727-28, 81 S.Ct. 1639.
[103] Irvin v. Dowd, supra note 87.
[104] State v. Rodriguez, supra note 82, 272 Neb. at 941, 726 N.W.2d at 169.
[105] State v. Strohl, 255 Neb. 918, 587 N.W.2d 675 (1999).
[106] See Patton v. Yount, supra note 93, 467 U.S. at 1035, 104 S.Ct. 2885.
[107] See Murphy v. Florida, supra note 94, 421 U.S. at 803, 95 S.Ct. 2031.
[108] Irvin v. Dowd, supra note 87.
[109] Casey v. Moore, 386 F.3d 896 (9th Cir. 2004); Jerrel v. State, 756 P.2d 301 (Alaska App.1988); Duke v. State, 99 P.3d 928 (Wyo. 2004).
[110] Brief for appellant at 94.
[111] State v. Harrold, 256 Neb. 829, 593 N.W.2d 299 (1999); Yount v. Seager, 181 Neb. 665, 150 N.W.2d 245 (1967); State v. Bruna, 12 Neb.App. 798, 686 N.W.2d 590 (2004).
[112] Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).
[113] See id.
[114] Id., 504 U.S. at 728, 112 S.Ct. 2222.
[115] Id., 504 U.S. at 738, 112 S.Ct. 2222.
[116] Id., 504 U.S. at 733-34, 112 S.Ct. 2222 (emphasis in original).
[117] Id., 504 U.S. at 730, 112 S.Ct. 2222.
[118] Id., 504 U.S. at 735, 112 S.Ct. 2222.
[119] Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
[120] Id., 472 U.S. at 325, 105 S.Ct. 2633.
[121] Id., 472 U.S. at 329, 105 S.Ct. 2633. See, also, State v. Lotter, 266 Neb. 245, 664 N.W.2d 892 (2003).
[122] Caldwell v. Mississippi, supra note 119, 472 U.S. at 329, 105 S.Ct. 2633.
[123] Id., 472 U.S. at 330, 105 S.Ct. 2633.
[124] Id.
[125] Id., 472 U.S. at 330, 332, 105 S.Ct. 2633.
[126] Romano v. Oklahoma, 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (citations omitted).
[127] See, State v. Hankins, 232 Neb. 608, 441 N.W.2d 854 (1989); State v. Reeves, 216 Neb. 206, 344 N.W.2d 433 (1984). See, also, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).
[128] Morgan v. Illinois, supra note 112.
[129] Id., 504 U.S. at 729, 112 S.Ct. 2222.
[130] Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).
[131] Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).
[132] Enmund v. Florida, supra note 130. See, also, Schad v. Arizona, supra note 57; Tison v. Arizona, supra note 131.
[133] Tison v. Arizona, supra note 131, 481 U.S. at 148, 107 S.Ct. 1676.
[134] Enmund v. Florida, supra note 130, 458 U.S. at 792, 102 S.Ct. 3368.
[135] Enmund v. Florida, supra note 130.
[136] Id., 458 U.S. at 799, 102 S.Ct. 3368.
[137] Id., 458 U.S. at 800, 801, 102 S.Ct. 3368.
[138] Id., 458 U.S. at 798, 102 S.Ct. 3368.
[139] Id., 458 U.S. at 801, 102 S.Ct. 3368.
[140] Tison v. Arizona, supra note 131, 481 U.S. at 173, 107 S.Ct. 1676 (Brennan, J., dissenting; Marshall, J., joins; Blackmun and Stevens, JJ., join in part).
[141] Tison v. Arizona, supra note 131, 481 U.S. at 149, 107 S.Ct. 1676.
[142] Id., 481 U.S. at 157-58, 107 S.Ct. 1676.
[143] Id., 481 U.S. at 153, 107 S.Ct. 1676.
[144] Id., 481 U.S. at 158, 107 S.Ct. 1676.
[145] Id.
[146] Brief for appellant at 55.
[147] State v. Parker, 221 Neb. 570, 379 N.W.2d 259 (1986). See, also, State v. Buckman, 237 Neb. 936, 468 N.W.2d 589 (1991).
[148] Id.
[149] See, State v. Buckman, supra note 147; State v. Parker, supra note 147. See, also, Schad v. Arizona, supra note 57; State v. Smith, 160 Ariz. 507, 774 P.2d 811 (1989); San Martin v. State, 717 So.2d 462 (Fla.1998); State v. Fry, 138 N.M. 700, 126 P.3d 516 (2005).
[150] Schad v. Arizona, supra note 57, 501 U.S. at 645, 111 S.Ct. 2491.
[151] State v. Smith, supra note 149, 160 Ariz. at 513, 774 P.2d at 817.
[152] Id.
[153] See, Schad v. Arizona, supra note 57; Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).
[154] Cabana v. Bullock, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), abrogated on other grounds, Pope v. Illinois, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987).
[155] Cabana v. Bullock, supra note 154, 474 U.S. at 385, 106 S.Ct. 689. Accord Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), over-ruled in part, Ring v. Arizona, supra note 4.
[156] Cabana v. Bullock, supra note 154, 474 U.S. at 385, 106 S.Ct. 689.
[157] Id., 474 U.S. at 386, 106 S.Ct. 689.
[158] Id.
[159] Id.
[160] State v. Bjorklund, supra note 72.
[161] Id. at 479, 604 N.W.2d at 211.
[162] See, State v. Lotter, 255 Neb. 456, 586 N.W.2d 591 (1998); State v. Ryan, 248 Neb. 405, 534 N.W.2d 766 (1995), abrogated on other grounds. Mata II, supra note 33.
[163] Ring v. Arizona, supra note 4. See, United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); Schriro v. Summerlin, supra note 19; Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[164] See Mata II, supra note 33.
[165] Ring v. Arizona, supra note 4, 536 U.S. at 589, 122 S.Ct. 2428.
[166] Oregon v. Ice, ___ U.S. ___, 129 S.Ct. 711, 717, 172 L.Ed.2d 517 (2009).
[167] Id.
[168] United States v. Booker, supra note 163, 543 U.S. at 232, 125 S.Ct. 738.
[169] Ring v. Arizona, supra note 4.
[170] State v. Ring, 204 Ariz. 534, 563, 65 P.3d 915, 944 (2003).
[171] Id. at 565, 65 P.3d at 946.
[172] Brown v. State, 67 P.3d 917, 920 (Okla. Crim.App.2003). But see Palmer v. Clarke, 293 F.Supp.2d 1011 (D.Neb.2003), reversed and remanded in part 408 F.3d 423 (8th Cir. 2005).
[173] Tison v. Arizona, supra note 131, 481 U.S. at 158, 107 S.Ct. 1676.
[174] Schriro v. Summerlin, supra note 19.
[175] Ring v. Arizona, supra note 4, 536 U.S. at 589, 122 S.Ct. 2428.
[176] See, e.g., Apprendi v. New Jersey, supra note 163; Jones v. State, 261 Ga. 665, 409 S.E.2d 642 (1991).
[177] See State v. Buckman, supra note 147.
[178] Id.
[179] See discussion infra Part V.5(a)(ii).
[180] Enmund v. Florida, supra note 130, 458 U.S. at 792, 102 S.Ct. 3368.
[181] See ง 29-2520(2) (Reissue 2008).
[182] See ง 29-2523(1)(a).
[183] See State v. Reeves, 234 Neb. 711, 453 N.W.2d 359 (1990), vacated and remanded on other grounds 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 409 (1990).
[184] Id.
[185] Id. at 733-34, 453 N.W.2d at 374-75 (citations omitted).
[186] See ง 29-2521(2).
[187] State v. Iromuanya, 272 Neb. 178, 719 N.W.2d 263 (2006).
[188] See, State v. Rife, 215 Neb. 132, 337 N.W.2d 724 (1983); State v. McDaniel, 17 Neb.App. 725, 771 N.W.2d 173 (2009); Butler v. State, 647 N.E.2d 631 (Ind.1995); Noe v. State, 616 So.2d 298 (Miss.1993); State v. Tharp, 27 Wash.App. 198, 616 P.2d 693 (1980).
[189] See, Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); State v. McPherson, 266 Neb. 734, 668 N.W.2d 504 (2003); State v. McDaniel, supra note 188.
[190] State v. Canady, 263 Neb. 552, 641 N.W.2d 43 (2002).
[191] Brief for appellant at 42.
[192] See งง 29-2520(4)(a) and 29-2521(2).
[193] State v. Hessler, supra note 7; State v. Bjorklund, supra note 72; State v. Strohl, supra note 105; State v. Ryan, supra note 162; State v. Anderson and Hochstein, 207 Neb. 51, 296 N.W.2d 440 (1980).
[194] See State v. Rust, 223 Neb. 150, 388 N.W.2d 483 (1986).
[195] See State v. Dunster, 262 Neb. 329, 631 N.W.2d 879 (2001) (distinguishing Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977)). See, e.g., State v. True, 236 Neb. 274, 460 N.W.2d 668 (1990); State v. Williams, 217 Neb. 539, 352 N.W.2d 538 (1984).
[196] See State v. Rust, supra note 194.
[197] Brief for appellant at 84.
[198] Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
[199] Neb.Rev.Stat. งง 81-1801 to 81-1842 (Reissue 2008). See, also, Neb.Rev.Stat. งง 81-1843 to 81-1851 (Reissue 2008).
[200] งง 81-1801.01 and 81-1851.
[201] ง 81-1848(1)(d)(iv).
[202] ง 81-1848(1)(d)(vii).
[203] Whipps Land & Cattle Co. v. Level 3 Communications, 265 Neb. 472, 658 N.W.2d 258 (2003).
[204] Keller v. Tavarone, 262 Neb. 2, 628 N.W.2d 222 (2001).
[205] Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). See, also, State v. Bjorklund, supra note 72; State v. Ryan, 257 Neb. 635, 601 N.W.2d 473 (1999).
[206] State v. Cook, supra note 65, 236 Neb. at 644, 463 N.W.2d at 579. Accord, State v. Barker, supra note 65; State v. Williams, supra note 195; State v. Reeves, supra note 127; State v. Anderson and Hochstein, supra note 193.
[207] Crawford v. Washington, supra note 198, 541 U.S. at 51, 124 S.Ct. 1354.
[208] Brief for appellant at 85.
[209] Crawford v. Washington, supra note 198, 541 U.S. at 38, 124 S.Ct. 1354.
[210] Id., 541 U.S. at 59, 124 S.Ct. 1354.
[211] Id., 541 U.S. at 61, 124 S.Ct. 1354.
[212] Id., 541 U.S. at 43, 124 S.Ct. 1354.
[213] Crawford v. Washington, supra note 198.
[214] Payne v. Tennessee, supra note 205, 501 U.S. at 820-21, 111 S.Ct. 2597.
[215] Williams v. New York, 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).
[216] See id.
[217] See, e.g., U.S. v. Monteiro, 417 F.3d 208 (1st Cir.2005); U.S. v. Luciano, 414 F.3d 174 (1st Cir.2005); U.S. v. Martinez, 413 F.3d 239 (2d Cir.2005); U.S. v. Katzopoulos, 437 F.3d 569 (6th Cir.2006); U.S. v. Littlesun, 444 F.3d 1196 (9th Cir.2006); U.S. v. Chau, 426 F.3d 1318 (11th Cir.2005); State v. McGill, 213 Ariz. 147, 140 P.3d 930 (2006). See, also, Szabo v. Walls, 313 F.3d 392 (7th Cir.2002); U.S. v. Fleck, 413 F.3d 883 (8th Cir.2005); U.S. v. Powell, 973 F.2d 885 (10th Cir.1992); U.S. v. Cantellano, 430 F.3d 1142 (11th Cir. 2005).
[218] David C. Baldus et al., Final Report on the Disposition of Nebraska Capital and Non-Capital Homicide Cases (1973-1999): A Legal and Empirical Analysis (2002).
[219] See David C. Baldus et al., Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview, With Recent Findings From Philadelphia, 83 Cornell L.Rev. 1638 (1998).
[220] State v. Lotter, supra note 162.
[221] State v. Palmer, supra note 45.
[222] See Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).
[223] ง 29-2521(3).
[224] State v. Bjorklund, supra note 72, 258 Neb. at 482, 604 N.W.2d at 213.
[225] State v. Lotter, supra note 162. See, also, State v. Dunster, supra note 195.
[226] Furman v. Georgia, 408 U.S. 238, 310, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring). See, also, Pulley v. Harris, supra note 222.
[227] See Baldus et al., supra note 218.
[228] Id.
[229] Brief for appellant at 91.
[230] Furman v. Georgia, supra note 226.
[231] Mata II, supra note 33.
[232] ง 29-2522; State v. Dunster, supra note 195.
[233] See, e.g., State v. Gales, supra note 25 (and cases gathered therein).
[234] State v. Moore, 210 Neb. 457, 316 N.W.2d 33 (1982).